638 So.2d 354 (1994)
LA PLAQUE CORPORATION, et al.
v.
CHEVRON U.S.A. INC.
No. 93-C-1597.
Court of Appeal of Louisiana, Fourth Circuit.
May 26, 1994.
Rehearing Denied July 19, 1994.
John M. McCollam, James L. Weiss, Jason A.T. Jumonville, Scott A. O'Connor, Gordon, Arata, McCollam & Duplantis, New Orleans, for relator, Chevron U.S.A. Inc.
George C. Gibson, Metairie, for respondents, La Plaque Corporation, et al.
Before SCHOTT, C.J., and BARRY and CIACCIO, JJ.
CIACCIO, Judge.
On remand from the Louisiana Supreme Court, we now consider whether the trial court erred in overruling defendant Chevron U.S.A. Inc.'s (Chevron) exception of prescription.[1]
In 1928, the State of Louisiana granted Southern Sulphur Corporation (Southern Sulphur), two mineral leases (State Lease Nos. 192 and 195) covering over 285,000 *355 acres of state lands and waterbottoms located in Plaquemines and Lafourche Parishes. In a subsequent sublease to Gulf Oil Corporation (Gulf), Chevron's predecessor, Southern Sulphur retained an overriding royalty interest as to all gas produced and saved from the leases equal to one-eighth (1/8th) of the net proceeds derived from the sale of the gas less certain deductions described in the sublease (overriding royalty).
In 1953, Southern Sulphur dissolved and liquidated. Seventy-one percent (71%) of the overriding royalty was assigned to Lillie Weir Simms and her descendants, each receiving an undivided interest proportionate to his or her percentage of stock in the corporation, and twenty-six (26%) percent of the overriding royalty was assigned proportionately to Charles Oliver, Henry Oliver, Jr., and the estate of Henry Oliver.
In 1964, Gulf entered into a gas purchase contract with Texas Eastern Transmission Corporation (Texas Eastern) to deliver certain quantities of gas over a 26 year term at a fixed price of approximately 19 cents per thousand cubic feet to increase by 3 cents annually. The contract, referred to as a "warranty contract", did not restrict the source of supply. Between 1964 and 1972, Gulf committed reserves to the contract which were not dedicated to other purchasers, including gas produced from State Lease Nos. 192 and 195. During that time the contract price exceeded the market price.
Plaintiffs in the present case, the Simms and Oliver heirs, are 52 owners of the undivided overriding royalty interest who filed suit against Chevron on June 4, 1990, alleging that in 1972 the market price of gas began to exceed the contract price and Chevron and its predecessor, Gulf, underpaid royalties on natural gas based on below market prices during the period 1972-1989.[2] Plaintiffs claim that the value used to pay their royalties due under the overriding royalty should have been calculated based on the average price paid for gas in the Louisiana intrastate gas market as established by the Louisiana Public Service Commission for the period from 1972 through 1989. In response, Chevron filed an exception of prescription, asserting that plaintiffs' claims covering the period 1972 through June 4, 1987, had prescribed on their face pursuant to the three year prescriptive period set forth in LSA-C.C. art. 3494. Plaintiffs filed an opposition to Chevron's exception, invoking the doctrine of contra non valentum and arguing that they did not learn the facts necessary to assert their claims against Chevron until they received a form letter dated August 10, 1988, from Benjamin Walsh, president of La Plaque Corporation. Plaintiffs contend that knowledge of the following facts was essential to the realization of their claims:
1. The price on which Gulf/Chevron computed royalties on natural gas paid to the plaintiffs;
2. The alleged market price during the period 1972-1989; and
3. The existence of the warranty contract between Gulf and Texas Eastern under which natural gas produced from State Lease Nos. 192 and 195 was sold.
Following an evidentiary hearing on Chevron's exception of prescription, the trial judge overruled the exception and found that the doctrine of contra non valentum agere non currit praescriptio applied. In rendering judgment, the trial judge gave reasons for judgment setting forth her findings of fact and conclusions. They provide in part:
Each of the plaintiff royalty owners and/or their representatives who testified in these proceedings claimed that they had no suspicion of or reason to suspect improper royalty payments by Chevron until receipt of a letter from Ben Walsh dated August 10, 1988. The plaintiffs claim that prescription did not commence to run until receipt of the August 10, 1988 Walsh letter, and that the running of prescription was interrupted by the filing of this action on June 4, 1990.
This court is convinced that the royalty owners did not have knowledge of the essential facts supporting their claim until *356 they received the August 10, 1988 correspondence from Mr. Walsh.
A key factor in this matter is the undisclosed terms of the gas sales contract between defendant and Texas Eastern Transmission Corporation, which did not dedicate any specific sources of supply, and which was not recorded in any official parish public records in Louisiana. The marketing of natural gas and the payment of royalties were matters exclusively under the control of the defendant/producer. Essential factors include the determination of sources of supply, the selection of the market price, the determination of daily delivery volumes, and, absent contractual control, the basis for calculating royalty payments. The essential information a royalty owner needed to have includes: knowledge that the affected gas was not covered or controlled by any gas sales contract, particularly the Texas Eastern contract of 1964, and could have been delivered to a better market than the inferior Texas Eastern Market; knowledge that the gas was sold to the inferior market for a long period of time; and that royalties were calculated and paid upon some basis determined by the management of defendant but less than the market price. The defendant never provided the plaintiff royalty owners any information on marketing issues, practices or problems, but provided to them only the "check stub" detail with monthly payments, which detail gave no hint of improper royalty payments based upon defendant's marketing practices.
Prior to 1988, the plaintiff royalty owners had feelings of trust, confidence and faith in defendant, based upon timely royalty payments, courteous responses, and a feeling of commonalty of interests, which were encouraged and nurtured by defendant, and which resulted in the lack of any suspicion of impropriety in the payment of royalties. The Court is impressed by the fact that the Louisiana State Mineral Board with a parallel royalty claim did not discover and prosecute its claim against defendant until October 1991, and some 17 months after plaintiffs herein had filed suit. If an entity as sophisticated as the Mineral Board did not discover the underpayment, how can these plaintiffs be expected to.
LSA-C.C. art. 3494(5) provides a liberative prescription of three (3) years to an action to recover underpayments or overpayments of royalties from the production of minerals, provided that nothing herein applies to any payments, rent, or royalties derived from state-owned properties.
The rule of prescription is subject to the discovery rule of contra non valentum agere nulla currit praescriptio, which suspends the running of prescription during the period in which the cause of action was not known by or reasonably knowable by the plaintiff. Harlan v. Roberts, 565 So.2d 482 (La.App.2d Cir.1990), writ denied, 567 So.2d 1126 (La.1990). In Jordan v. Employee Transfer Corp., 509 So.2d 420 (La.1987), the Louisiana Supreme Court clarified its application of contra non valentum and held that prescription begins to run, not at the earliest possible indication that the plaintiff may have suffered some wrong, but rather when the plaintiff has a reasonable basis to pursue a claim against a specific defendant. Contra non valentum is an exceptional remedy recognized by our jurisprudence which is in direct contradiction to the articles in the Civil Code and therefore should be strictly construed. Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979); and Harsh v. Calogero, 615 So.2d 420 (La.App. 4th Cir.1993).
At the evidentiary hearing, several of the plaintiffs and/or their representatives testified, and both parties introduced numerous exhibits into evidence. Kenneth Franzheim II, an heir of Lillie Weir Simms and trustee of the trusts created by Simms, testified that he was in the oil and gas business for thirty years, was familiar with natural gas sales contracts, and was an experienced oil and gas businessman who had participated in oil and gas ventures in ten states. Franzheim testified that he knew about the prices paid for natural gas in Louisiana during his thirty year affiliation with the petroleum industry, was aware of the Texas Eastern Contract since 1964, and that the value on which Gulf/Chevron paid royalties was reflected *357 on, or ascertainable from, his monthly check detail.
Several of the other Simms heirs testified that they had retained attorneys, accountants, and oil and gas consultants who managed the overriding royalty and monitored their royalty payments. Among these were Walsh, who had served as a district manager of the Louisiana Department of Conservation, David J. Sollenberger, Jr., a petroleum geologist employed by Gulf/Chevron from 1967 to 1988 and, Lawrence Eustis, a petroleum geologist, also employed by Gulf at one time. Walsh, Eustis and Sollenberger are the shareholders, directors and officers of La Plaque Corporation.
The testimony at the hearing disclosed that the overriding royalty interests of the Oliver heirs was managed by Pittsburgh National Bank (PNB) since before 1964. Rea Miller, a vice president and trust officer with the bank, testified that under several agency agreements, PNB had extensive powers and authority to manage, oversee and protect the Oliver heirs' overriding royalty. According to Miller, the minerals section of PNB's real estate department managed the interests on a daily basis. Since the late 1950's, PNB had recruited experienced oil and gas consultants in New Orleans to oversee the overriding royalty. The record reflects that from 1962 to 1967, PNB's consultant, Leslie Bowling, a petroleum geologist, ran an office called Oliver Oil Enterprises staffed by four persons, including Sollenberger. The sole purpose of Oliver Oil Enterprises was to oversee matters concerning the overriding royalty and to gather information to ensure that the royalties were paid properly.
In 1977, PNB hired Eustis to advise it with respect to the overriding royalty. Sollenberger, then the Gulf employee responsible for State Lease Nos. 192 and 195, assisted Eustis as an adviser to the bank. In 1982 Walsh joined PNB's consulting team.
A review of the evidence in the record indicates that on a monthly basis from the date of first production under the contract, plaintiffs received detailed information along with their royalty checks. From 1984 to present, the check details reflected the value per unit on which the plaintiffs' overriding royalties were computed. Prior to 1984, the check detail contained the gross revenue and gross volume from which plaintiffs could compute the per unit value. The plaintiffs who testified at the hearing admitted that the monthly check details reflected the value on which their royalties were computed. Furthermore, the record reflects that Gulf/Chevron, at the request of several of the plaintiffs, would send the check details to plaintiffs' oil and gas advisors, accountants, lawyers and banks.
plaintiffs argue that Gulf/Chevron should have computed their royalty payments based on the market value of gas paid by intrastate pipelines for gas purchased in Louisiana and that the market value was not known to them. The evidence before us indicates otherwise. An affidavit by the Secretary of the Louisiana Public Service Commission states that, by law, pipelines must report the market price of gas on a monthly basis to the Public Service Commission which has reported the prices in the public records in its Baton Rouge offices since 1972. Clearly, the information on the market value of gas was available to plaintiffs in the public records. We also note that the check details sent to plaintiffs with their payments reflected the difference between the value on which royalties were computed for gas sold under the contract and the price paid by other pipelines for gas produced from the state leases. Walsh himself testified that he, Eustis and Sollenberger reported the disparity in the 1982 and 1983 evaluations sent to the Simms and Oliver plaintiffs.
Plaintiffs also allege that they had no knowledge of the contract terms under the warranty contract. This claim is meritless. Sollenberger testified that he learned of the key terms under the contract from several sources while employed at Oliver Oil Enterprises in the 1960's, including Gulf personnel, local newspapers and public hearings. He testified that he was aware of the price paid, that the gas from State Lease Nos. 192 and 195 was delivered under the contract, and that it was a warranty contract. Eustis testified that in 1982 Gulf/Chevron furnished him with detailed information on the contract which he forwarded to the Oliver plaintiffs. *358 The record also contains a copy of a letter dated February 26, 1982 that Eustis, acting as an agent for the Oliver plaintiffs, sent to William J. Cooper, Assistant Vice President of the Trust Division of PNB, which indicated that he had knowledge of the warranty contract, identified the purchaser under the contract, and specified the price paid by the purchaser, Texas Eastern. The information included the warranty nature which allowed Gulf to shift gas from one purchaser to another, the price paid under the contract, the source fields for the contract, and the fact that gas was sold to other purchasers at a higher price. Eustis further testified that in 1988, at Walsh's request, he obtained a copy of the contract from Delta Development Corporation, his employer at the time. Walsh testified that he had learned of the existence of the contract in the 1970's and that it was a matter of general knowledge. The record also indicates that the contract has been maintained by the Federal Energy Regulatory Commission as a public record.
It is well settled that a plaintiff bears the burden of proving that the doctrine of contra non valentum should be applied to interrupt or suspend the running of prescription. Intercoastal Seafood Co. v. Scott, 556 So.2d 974, 976 (La.App.3rd Cir.1990). A plaintiff will be deemed to know that which he could have learned from reasonable diligence. Matthews v. Sun Exploration & Prod. Co., 521 So.2d 1192, 1197 (La.App.2d Cir.1988).
In the instant case, the uncontradicted testimony in the record establishes that Gulf/Chevron freely disclosed and furnished all pertinent information regarding the warranty contract and payment of the overriding royalty to plaintiffs and their representatives upon request. The monthly check detail received by plaintiffs provided an address for royalty payment inquiries and Gulf/Chevron had a policy of providing royalty owners with any assistance they may need to verify the correctness of their royalty payments. Likewise, the testimony clearly establishes that Walsh, Eustis and Sollenberger each knew of the existence of the contract and its terms.
The trial court's reliance on the fact that the State Mineral Board did not prosecute its suit until after plaintiffs filed the present suit is misplaced. This fact does not necessarily mean that the state did not know about the operative facts long before it filed suit; and even if it did not have actual knowledge of the facts they were reasonably knowable by the state at least by 1982. In any event the state's claim was not barred by the three year prescription so that its decision not to file suit prior to 1991 is irrelevant to the plaintiffs' case.
In light of these circumstances and the fact that the contract and the market price of gas were public records available to the plaintiffs, we conclude that the trial court was clearly wrong in finding that the royalty owners did not have knowledge of the essential facts supporting their claims until August 10, 1988 when they received the form letter from Walsh. We further conclude the trial court was clearly wrong in failing to find that plaintiffs should have known of the essential facts supporting their claims prior to their receiving Walsh's letter.
Accordingly, for the above reasons, the judgment of the trial court overruling defendant Chevron U.S.A. Inc.'s exception of prescription is reversed. Judgment is hereby rendered in favor of Chevron U.S.A. Inc., sustaining its exception of prescription and dismissing plaintiffs' claims for underpayment of royalties for the period prior to June 4, 1987.
REVERSED AND RENDERED.
NOTES
[1] La Plaque Corporation, et al. v. Chevron U.S.A. Inc., 629 So.2d 1158 (La.1993).
[2] La Plaque Corporation was formed by Benjamin Walsh and Lawrence Eustis in 1988 for the sole purpose of pursuing the claims of the 52 owners of the overriding royalty interests and filing suit against Chevron.