657 So.2d 1378 (1995)
HOSPITAL SERVICE DISTRICT NO. 1 OF JEFFERSON PARISH d/b/a West Jefferson Medical Center
v.
Carlos ALAS, et al.
No. 94-CA-897.
Court of Appeal of Louisiana, Fifth Circuit.
June 28, 1995.
*1379 George M. Papale, Stumpf, Dugas, Leblanc, Papale & Ripp, Gretna, for plaintiff-appellant.
Harry S. Hardin, III, Jones, Walker, Waechter, Poitevent, Carriere & Denegre, New Orleans, Henry L. Klein, New Orleans, for defendant-appellee.
Before KLIEBERT, GRISBAUM and WICKER, JJ.
GRISBAUM, Judge.
This appeal involves a claim originally filed by Hospital Service District No. 1 of Jefferson Parish, (West Jefferson Medical Center) against its former Chief Financial Officer, Carlos Alas. West Jefferson added the Bank of Louisiana, successor to Bank of the South, as a defendant, alleging its failure to observe reasonable commercial practices surrounding the opening and operation of an account Alas used to embezzle West Jefferson's money contributed to the hospital's loss. Bank of Louisiana raised an exception of prescription, because suit was filed more than one year after the account was closed. West Jefferson argued the suit was not prescribed and/or prescription had not run due to the doctrine of contra non valentem. The trial court reserved ruling on the prescription issue until after a trial on the merits. After the trial, the trial court held the action against Bank of Louisiana had prescribed nor could West Jefferson use the doctrine of contra non valentem to avoid prescription because it had not exercised due diligence in pursuing information which would have revealed its claim against Bank of Louisiana. We affirm.

THE BASIC RECORD FACTS.
Carlos Alas was the Chief Financial Officer at West Jefferson Hospital, who embezzled over $1.6 Million from the hospital's interest on its investments. The record reflects he began his relationship with Bank of the South (BOS), the predecessor of Bank of Louisiana (BOL) in 1983 when he brought BOS the largest single CD at its Lapalco branch. According to the testimony of Dwayne Gannard, the Lapalco branch manager from 1983-1986, he would have done anything Alas requested due to his status as a valued customer.
In July 1983, Alas opened a demand deposit account and referred to it as "West Jefferson General Hospital, CU." Alas told Gannard the account was for the West Jefferson Federal Credit Union, however neither "Federal" nor "Credit Union" appeared on the signature card or resolution form. Gannard felt no need to question Alas's authority since he knew Alas was the Chief Financial Officer of West Jefferson Hospital and valued having the entity as a customer.
It is undisputed that Alas never had checks printed for the CU account and that he always used temporary checks or counter checks. It is also undisputed Alas did not have statements for this account mailed to the hospital. Susan Autin, a teller at BOS in during 1983, testified it was not unusual for a money market account holder to use temporary checks due to the limited number of checks that could be written on such an account. However, there was ample testimony in the record this was not an unusual practice and was no cause for suspicion on the part of Bank of the South.
William Townsend served on the West Jefferson Board of Directors from 1982 until *1380 1990, and he also served on the Finance Committee of the hospital during this time. Townsend testified it was hospital policy to have two signatures on its operating accounts. Although it was hospital policy to have a resolution of the Board of Directors to open new accounts, Alas was able to open the CU account with only his signature and an incomplete resolution. Townsend testified he had no knowledge of the CU account before the publicity surrounding Alas's earlier criminal trial.
Mona Noble primarily worked with Carlos Alas with regard to financial matters. Between 1983-1988 Noble's job included reconciling bank statements with investments at the end of the month in order to prepare the financial statements of the hospital. Alas would give quotation sheets at the end of the month upon which he would list maturities and the amount of interest he had received. On this same sheet, Alas would indicate the disposition of theses maturities, whether he had reinvested them, and at what interest rate and period of time.
Noble testified regarding office procedure. First the interest checks were received in the mail room, any check or correspondence from the banks was directed to Alas's office, where they were placed on his desk UNOPENED. When Alas would get an interest check, he would normally give it to his secretary, who would make a copy of the check and deposit slip. The copies would go into the deposit book while the original checks went to the bank.
The hospital received the deposit receipt generated by the bank, which indicated only the total number amount of deposits. Noble would mathematically tabulate the quotation sheets Alas gave against the deposit tickets. Between 1983 and 1988 there was never a time the copies of the checks did not reconcile against the deposit receipts. Noble testified it was never part of her job responsibilities to make mathematical calculations on the interest itself, although she had the necessary information available to her. She testified it was Alas's job to calculate interest rates.
Noble indicated she had no clue Alas was making changes in the copies of the checks that he was putting into the investment journals that he gave her once a month. Alas also recorded the interest on a cash basis and did not put the yield. It was not until May 1989 that Noble became aware of the scheme when she was told to check on any discrepancies regarding investment interest. It was only when Noble obtained copies of the interest checks made from the original checks located at the bank that it was realized Alas must have altered the copies he made of the checks that would be placed in the hospital records.
Noble testified to an incident that occurred in early 1983. She stated one day Sharon Mura, Alas' secretary, silently placed an envelope on her desk. The envelope contained a bank statement Noble had never seen before, which concerned an account at Jefferson Guaranty Bank. Noble testified she was not aware of the Jefferson Guaranty account at that time. The envelope was addressed to West Jefferson General Hospital FCU[1].
Thinking this was a Credit Union account, Noble testified she brought it to the attention of John Smith, president of the Credit Union. According to Noble, Smith questioned Alas about the account and Alas told Smith he used the account to deposit money from his nightclubs into in order to avoid paying taxes. Smith apparently told Alas to close the account, which he did. Earlier Noble had testified Alas had no authority to open a checking account in the name of West Jefferson Hospital without a signature card and resolution from the board of directors. Noble testified she never disclosed this information to the hospital administration or members of the board because she did not think hospital funds were involved.
*1381 It was revealed through testimony that when Alas would take a check from a financial institution such as E.F. Hutton, etc., he would tell Noble the statement was lost in the mail or had not been received. So the next month Alas would make adjustments to the financial statements to make them match. When no statement was received, Noble testified she did not have authority to request a copy from the financial institution for the hospital's records. Only Alas had the authority to request another statement.
William Townsend testified he never personally computed the interest reported by Alas to determine whether the return on the investments was consistent with the stated return in the investment schedule, nor did anyone else. Townsend testified he could not state what checks and balances or security the hospital had in place during the time Alas was there to insure Alas himself did not steal. Townsend stated never, as a member of the Finance Committee, did he take the 1099 forms and add them up to see whether all the interest income found its way into the FNBC account the hospital had specifically designated to receive investment income.
Townsend could not state whether the hospital delegated to anyone the responsibility of checking to see that the investment earnings were deposited into the hospital accounts. Townsend further testified he never attended or participated in meetings to determine what tests would be performed on what accounts in connection with the annual audit.
Charlene Camus, an employee of West Jefferson Federal Credit Union, confirmed Alas stated he was using the FCU account to avoid paying taxes. Camus testified she checked the credit union board of directors minutes and could not locate a resolution to open an account at Jefferson Guaranty Bank. Nor was Camus aware of any resolution by West Jefferson Federal Credit Union for opening an account at Bank of the South. Tim Burke testified the hospital did not require an audit of the fake FCU account in 1983. Camus testified she knew Alas's use of the FCU account was unethical and could be a federal crime. However, Camus stated she did not tell any auditor of the account Alas used because she did not think it affected credit union funds.
David Smith, president and CEO of West Jefferson Medical Center, testified he had no knowledge of the FCU account at Jefferson Guaranty or the CU account at BOS until the attention received because of the lawsuit. Smith testified he first gained knowledge of the CU account at BOS in June of 1989.
Smith testified at no time did member of the board or Finance Committee question numbers Alas reported as investment income. Smith testified he delegated the responsibility of seeing that West Jefferson actually received the income that it was supposed to have received on its investments. Townsend testified that while Alas was in the posture of investment watchdog, Alas himself was supposed to be watched by the administration.
Smith testified he was unaware of the hospital policy that banking mail was only opened by Alas. However, later Smith testified the checks coming in were not logged by someone independent of Alas but went to Alas so others could not open them.
Smith, as CEO, testified he did not participate in the preparation of the engagement letter regarding the Peat Marwick yearly audits. Smith did state the hospital did not require the auditors to actually make a computation of the interest earned from any investment source versus what was deposited in the NOW account, he only required the books to be audited.
Timothy Burke, who was the comptroller of West Jefferson, testified at no time did the hospital take steps to insure that the investment checks received by the hospital were logged by personnel independent of Carlos Alas. According to Burke, the hospital did not require its own internal auditor nor the independent auditor to compute on a monthly basis the total amount of interest which should have been received on the hospital's *1382 investments. Furthermore there was no reconciliation of the annual 1099 statements from the institutions where West Jefferson made investments versus the total investment income reported by Alas, instead the 1099s went to Alas and were kept in his office.[2]
Timothy Burke, the comptroller of West Jefferson Medical Center, testified regarding the internal controls relative to receipt and recordation of the Hospital's investment income. First, Alas's mail went unopened, as did all senior management, to his office and was paced unopened on his desk. Burke explained this was to avoid clerical people handling large amounts of money. Burke stated another internal control in place was to never keep the investments themselves at the Hospital. Instead they were usually kept at the various institutions.
Mona Noble would record the investment income, which Burke considered a segregation of duties. Furthermore, the Hospital always required two signatures on the its operating accounts. The check signature facsimile machine was kept under lock and key in a different office. Burke testified the Hospital never kept any large amounts of cash on the premises and the interest payments were always made payable to the institution and were never received in cash.
Burke testified once the investment checks were received in Alas's office, he would instruct the secretary to make a copy for her files and then the check would be deposited. Deposits would accumulate during the month and at one date Alas would put together information for Noble to post.
Burke testified the Hospital never received any criticism by audit report or management letter concerning the manner in which the mail was received on investment funds or the manner in which the safe-keeping of receipts were held.
Tim Doolan, an employee of Peat Marwick who participated in the 1985-86 audits of the hospital, initially testified that Peat Marwick did not test the hospital's internal controls. Doolan stated investment income was not viewed as a significant audit area because the possibility of a material misstatement as it related to the financial statement as a whole is rare. According to Doolan, investment income was not confirmed because of the cost benefit of attempting to accumulate all of the information that would allow one to obtain some reasonable conclusion as to investment income.
Doolan claimed he had never been involved in an audit in which investment income was confirmed. However, he would perform tests in order to see if rates were reasonable rates. Doolan stated he did not reach an opinion as to the reasonableness of West Jefferson's investment rates standing alone.
Doolan testified on cross exam that he did not see any weakness in the hospital's internal controls. However, he admitted management was in a position to lie to auditors and circumvent internal controls.
Albert Richard III, a CPA and auditor for Peat Marwick, testified that auditors examine financial statements for the purpose of expressing an opinion on the fairness of the financial statements. Richard testified the detection of fraud was not the purpose of the audit. Richard's testimony referred to Peat Marwick Exhibit 6, which is a management override memo. The memo indicates in Peat Marwick's opinion management override did not pose a significant risk.

STANDARD OF REVIEW
This is a classic Arceneaux review in that we are called upon to determine whether the trial court had a reasonable factual basis for its factual conclusions; and then determine whether it applied the appropriate law in relation to prescription.

ANALYSIS
The opening of the CU account at BOS occurred in April of 1983 and the last *1383 withdrawal was made on June 10, 1988. It is undisputed that the one year prescriptive period applies. The lawsuit was filed on July 12, 1989, more than one year after the account closed. Under Louisiana law, when a claim is prescribed on its face the plaintiff bears the burden of proving interruption or suspension of prescription. Lima v. Schmidt, 595 So.2d 624 (La.1992).
West Jefferson asserts the date it acquired knowledge of Alas's embezzlement was May 22, 1988. On that date, David Smith, CEO of West Jefferson, received an anonymous phone call indicating Alas was stealing the hospital's interest money. Thus, the hospital argues the doctrine of contra non valentem should apply because it had no knowledge of its cause of action until May 22, 1988.

Doctrine of Contra Non Valentem
Our jurisprudence tells us that to avoid the running of prescription, a plaintiff must show he did not know of facts upon which to base a claim nor did he have reason to know or discover such facts, and that the lack of knowledge is not attributable to his fault. See Corsey v. State Dept. of Corrections, 375 So.2d 1319 (La.1979); Curtis v. Greenberg, 592 So.2d 501 (La.App. 5th Cir. 1991), writ denied 593 So.2d 381 (La.1992).
For purposes of the discovery doctrine of contra non valentem, a plaintiff will be deemed to know that which he could have learned from reasonable diligence. LaPlaque Corp. v. Chevron, USA, Inc., 638 So.2d 354 (La.App. 4 Cir.1994). "If an opportunity is afforded to a party to know and to learn about a certain matter bearing on his interest and he fails or refuses to profit by it, if he closes his eyes to the notice spread before him and shuts his ears to oral information directly imparted to him, the law will hold him as bound by the same, and as fully notified as if he had taken thorough personal cognizance at the time of the information imparted and of the notice given." Bory v. Knox, 38 La.Ann. 379 (La.1886).
With these principles in mind, we now turn to the record to determine whether West Jefferson exercised due diligence in its discovery of the fraud perpetrated by Alas.

Diligence in controlling and checking on Alas' activities.
The record is replete with testimony demonstrating how Mr. Carlos Alas was such a trusted employee, and no one ever suspected he was embezzling money from the hospital. However, the record likewise reflects that the hospital had no security or checks whatsoever over its chief financial officer. This is initially reflected in the testimony of West Jefferson CEO, David Smith, and a former chairman of the board, William Townsend. Smith testified he delegated the responsibility of seeing West Jefferson actually received the income it was supposed to receive on its investments to Alas. However, Townsend testified that although Alas was in the posture of investment watchdog, Alas himself was supposed to be watched by the administration.
Townsend testified he could not state what checks and balances or security the hospital had in place during Alas's tenure in order to insure Alas himself did not steal. Nor could Townsend state whether the hospital delegated to anyone the responsibility of checking to see whether the investment earnings were deposited into the hospital's accounts.
The record indicates Alas was placed in a position of complete control without any security or checks on him. For instance, Alas possessed complete autonomy to control the hospital's deposits. According to hospital policy, no one was allowed to open credit union mail, banking mail, or any mail containing interest checks except Carlos Alas. Melanie Owens, whose testimony from the criminal trial was introduced pursuant to stipulation, testified the hospital's own internal rules provided Alas's mail to be handled differently. For instance, anything dealing with the Credit Union was to be placed in Alas's box unopened. Furthermore, when Alas or his secretary were not in, the mailroom was instructed not to place Alas's mail *1384 with the mail that went to David Smith's office, but Alas would pick it up at his convenience.
In his deposition, Alas stated he had sole authority over whether to leave interest income in an account or roll the interest from a CD over. Alas stated at no time were his actions with respect to the hospital's investments ever questioned.
Mona Noble, whose job was to reconcile bank statements with investment records at the end of every month, testified she had no authority to request a duplicate statement from any financial institution. Testimony revealed that whenever Alas would steal a check from a financial institution such as E.F. Hutton, etc., Alas would tell Noble the statement was lost in the mail or had not been received because he knew the statement would have reflected an interest check paid to the hospital that Noble would not be able to account for on her deposit record. In reality, Alas intercepted the statement. Only Alas had the authority to request a duplicate statement from a financial institution or bank.
As far as the missing statements were concerned, in June 1986, Alas used the FNBC to launder a CD from Colonial Bank. Through the use of a counter check, Alas withdrew from the FNBC NOW account $210,000.00. To hide this defalcation, he intercepted the monthly statement which Mona Noble typically reconciled. Notwithstanding Mona Noble had the responsibility of reconciling each statement on this, the hospital's most important account, no one followed up on the missing statement.
This practice placed the hospital, with an investment portfolio ranging from $13-35 Million, in a position of not having complete financial records. Instead the hospital placed Alas in a position where he was the only one who saw the original checks and the only one who could obtain duplicate statements generated by outside sources. Had West Jefferson been diligent in completing its records or allowing more than one individual to be able to request duplicate statements from institutions, Alas's scheme would have been discovered.
Another example of the hospital's lack of diligence with respect to giving Alas unfettered control over the financial affairs of the hospital is seen in the issue of whether the hospital allowed Alas to open accounts in its name by himself. Former Board of Directors member Townsend testified whenever West Jefferson opened accounts at various institutions, it would do so by a resolution enacted at a meeting of the Board of Directors. However, Townsend was shown several incomplete resolutions for opening accounts, resolutions with the incorrect name of the corporation, and resolutions allegedly passed by the Board of Directors, when in fact there was no meeting on the date of the resolution.
Alas disputed there was a hospital policy requiring resolutions to open accounts. In his deposition, Alas claimed the hospital did not have a policy that it had to actually pass resolutions regarding the handling of its business. As an example Alas testified how he opened a NOW account at FNBC on behalf of the hospital without a resolution passed by the board. According to Alas, the only time there was a resolution passed was when the hospital changed some accounts from Guaranty Bank to Investors Bank.
Furthermore Alas testified that the secretary of the Board of Directors, Deamore, would sign these resolutions, several at a time, while at David Smith's desk. Alas never recalled Deamore consulting the minutes or records of the board meetings to verify what he was signing.
No one besides Alas actually checked on the hospital's accounts. Alas claimed he presented David Smith with documents reflecting the existence of the CU account at the end of the year when the hospital would send letters confirming the existence of accounts and balances to banks where it did business. However, Smith never questioned or had anyone else check the documents listing these accounts given to him by Alas.
It is undisputed Alas did not have an authorized resolution from West Jefferson to *1385 open the CU account at Bank of the South. We find the record reflects had West Jefferson been diligently conducting its business affairs, the fraud would have been discovered sooner.

The finance committee had notice of things which an inquiry would have revealed Alas's scheme.
BOL directs the Court's attention to Exhibit BOL-15, which is a report presented to the Finance Committee on the date of December 12, 1985. Which reflects income of $1,629,806 on total invested funds of $29,584,656. This computes to an annual return of 6.009%. During this time the record shows that the Wall Street Journal and the hospital's own investment schedule indicated the hospital should have been receiving 8½ to 9%. We take note that Alas would often buy CDs and other investments at less than par value, ergo the true value would have been higher than market value since the investment was purchased at a discount.
On January 14, 1986, the Finance Committee received another report by Alas. Here the interest reported was $1,869,386 on total funds of $29,775,689. The return, which is figured by simple computation was 6.278%, which was substantially below market rates at the time. Exhibit BOL-16. Furthermore the June 12, 1986 report indicates an average interest rate for May 1986 as 6.5%. Exhibit BOL-17. However, a list of investments purchased shortly thereafter indicated that the hospital invested in Federal Home Loan Mortgage pools and other investments at yield between 9.23 and 9.73. Yet, no one questioned Alas's figures of a 6.5% return for that period.
Exhibit BOL-61 is a typical schedule of investments available at all times to the Finance Committee. The yield on those investments ranged between 8 and 9.73%. However, no one compared those figures to the lower rate of return when Alas reported to them, nor did they question the discrepancy of how on earth could the hospital be investing in everything that yielded 8.5% or higher and yet have a total return of less than 7%.
The report presented to the committee in October of 1987 showed interest earned as $1,845,104 on total investments of $35,674,188, for a return of 6.24%. The Committee had before them or at their disposal, an investment schedule which showed $10.6 million was invested at 8% and $15.2 million was invested at 8½% and an additional $1.3 million invested at 10.95%. Yet never was there a question regarding why the total return was on average two percentage points lower than the reported rates on the investment schedules.
Carlos Alas stopped skimming interest in early 1988. Prior to that time, the Finance Committee had become accustomed to reports indicating the hospital was receiving a return of 6.5%. The April 19, 1988 report to the committee reflected that interest income for the first quarter of 1988 was $803,428.00 on total investments of $38,183,373.02. This put the Hospital's annualized investment return on track to reach 8.416%, a rate much closer to the prevailing market rate at the time. Yet, not one member of the Finance Committee noticed the jump or asked the reason behind it. Nor did any member of the Finance Committee ever question anything Alas reported from 1983 until 1988.
After all is said and done, we conclude that the trial court was eminently correct in its well reasoned reasons for judgment. Therefore, West Jefferson's cause of action against the Bank of Louisiana has prescribed because it had more than ample opportunity to discover the fraud for a year after Alas closed the CU account at Bank of the South and because West Jefferson did not exercise due diligence, it is not entitled to benefit from the doctrine of contra non valentem. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.
NOTES
[1] Alas testified the designation "FCU" used on this account was his abbreviation for "funded cash unlimited".
[2] West Jefferson received 1099 forms from every institution where it had an investment. The 1099s reported the actual income earned on the investments placed at that institution. However because of the hospital's tax exempt status, the 1099s were not part of the hospital's tax records.