838 So.2d 821 (2003)
AMOCO PRODUCTION COMPANY
v.
TEXACO, INC., et al.
No. 02-240.
Court of Appeal of Louisiana, Third Circuit.
January 29, 2003.
Rehearing Denied March 19, 2003.
*825 J. Michael Veron, Patrick D. Gallaugher, Jr., Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles, LA, Anthony J. Fontana, Jr., Abbeville, LA, James A. Gillespie, BP Amoco Corporation, Legal Group, Houston, TX, for Plaintiff/Appellee/Cross-Appellant, Amoco Production Company.
Silas B. Cooper, Jr., Cooper & Woodruff, Abbeville, LA, Reginald J. Ringuet, William H. Collier, Ringuet, Daniels & Collier, Lafayette, LA, for Defendant/Appellant/Cross-Appellee, IMC Exploration Company.
P.J. Laborde, Jr., The Laborde Law Firm, Lafayette, LA, for Defendant/Appellant/Cross-Appellee, Mallinckrodt, Inc.
Court composed of SYLVIA R. COOKS, GLENN B. GREMILLION and ELIZABETH A. PICKETT, Judges.
COOKS, Judge.
This appeal arose from a suit filed in 1994 by Amoco Production Company against IMC Exploration Company and its corporate parent, Mallinckrodt, Inc., for deliberately violating a reassignment clause contained in mineral subleases that had been executed by the parties' predecessors-in-title. Prior to trial, the trial court denied IMC's exception of prescription, and granted a directed verdict in favor of Amoco on the issue of liability finding IMC had breached the reassignment clause. The trial court also granted summary judgment in favor of Amoco "piercing the corporate veil" and holding Mallinckrodt liable for any judgment rendered against IMC. The jury eventually rendered a damage award of $30,000,000.00 in favor of Amoco. IMC and Mallinckrodt have appealed numerous aspects of the judgment and proceedings below. Amoco filed a cross-appeal arguing the trial court erred in granting Defendants' motion in limine which prevented Amoco from presenting to the jury evidence of the "present value" of the production income it lost because of the breach.

FACTS
In the 1950's Amoco, then known as Stanolind Oil & Gas Company, acquired five mineral leases located in the Maurice Field of Vermilion Parish. Stanolind subleased the mineral leases to Charles Wrightsman and Seaboard Oil Company (predecessor-in-title to Texaco) in 1955.[1] *826 The subleases contained the following "reassignment" provision:
In the event that the Assignee should elect to surrender, let expire, abandon or release any or all rights in said lease acreage, or any part thereof, the Assignee shall notify the Assignor not less than sixty (60) days in advance of such surrender, expiration, abandonment or release, and if requested to do so by the Assignor, the Assignee immediately shall reassign such rights in said lease acreage, or such part thereof, to the Assignor.
The leases were granted for a primary term of five years but would continue in effect so long thereafter as oil, gas or other minerals were produced in paying quantities or drilling operations were being continuously conducted, without the lapse of more than 90 days. Amoco retained a one-sixteenth overriding royalty interest in the leases.
In February of 1976, IMC was formed. In March of 1976, IMC acquired hundreds of mineral leases from Wrightsman, including the above mentioned subleases. In 1976, production on one of the five leases (the Jenkins lease) fell drastically because of mechanical problems. After attempting repairs, IMC and Texaco abandoned the unit well and allowed the Jenkins lease to expire. A formal release of the Jenkins lease was filed in the conveyance records of Vermilion Parish in March of 1977. Amoco maintained it was not notified of the expiration of the Jenkins Lease as required by the reassignment clause. Amoco presented testimony that had it been notified it would have kept the lease alive by beginning new drilling operations. According to Amoco, "the motive for this breach later became apparent when IMC and Texaco subsequently took new leases in their own names on this property. In this fashion, IMC and Texaco `washed out' Amoco's lease and obtained a new lease directly from the landowner."
In 1981, the remaining four leases were still in production and formed part of the "Miogyp Unit." Earlier, in 1980, several of Texaco's and IMC's lessors complained they were not receiving proper royalties under the leases and filed suit. In settlement of these demands, Texaco and IMC released the non-unitized portions of these leases and the landowners granted new, three year term leases to IMC and Texaco. These leases were recorded in the Vermilion Parish records. Amoco alleged it was not notified of the release in violation of the reassignment clause and, as a result, its leases were extinguished in part and it lost overriding royalties on the released acreage. Amoco noted because only non-producing parts of Amoco's leases were canceled, there was no sharp decrease in royalty receipts to alert it that the leases had been compromised.
Amoco further alleged IMC participated in a "scheme in which the leases were either allowed to expire or were canceled behind Amoco's back and then new leases were acquired by IMC in its own name." Shortly after IMC acquired the leases covering the released acreage, new gas deposits were discovered, which generated million of dollars in production revenue.
In 1993, Amoco hired John Coalson, a landman, to conduct an audit of Amoco's properties which were operated by outside companies. Coalson discovered that Norcen Explorers, who in 1989 began operating the Marg-Tex units in the Maurice Field, sent division orders to everyone with an interest in the field, which included Amoco.[2] Amoco was receiving division orders *827 from Norcen because it had a small interest in the Marg-Tex units from other non-released portions of leases which were situated in the area of the units. Upon reviewing the division orders, Coalson determined Norcen's calculations of Amoco's share of production was less than what Amoco's records indicated it should have been. Coalson asked representatives of Amoco to send a letter to Norcen questioning its calculations and noting that "Amoco's royalty and overriding royalty have been maintained by production from various units from the 1950's to the present." Coalson then sent a contract abstractor to examine the Vermilion Parish records, who informed him of the lease cancellations.
Months after the discovery of the lease cancellations, Amoco filed this suit on April 29, 1994, alleging Texaco and IMC breached the reassignment clause of the 1955 subleases in 1981, when they released the non-unitized portions of the leases maintained by the Miogyp unit production without giving notice to Amoco. Eventually, Amoco dismissed Texaco from the litigation and proceeded solely against IMC. In June of 1998, Amoco amended its Petition to join IMC's parent, Mallinckrodt, Inc., as an additional defendant.
In 1986, IMC was sold to Wintershall. After the sale, the Board of Directors of IMC declared a dividend of approximately $97 million in favor of its sole shareholder, Mallinckrodt.[3] Amoco sought to "pierce the corporate veil" and hold Mallinckrodt liable for any judgment rendered against IMC. It filed a motion for summary judgment on this issue. On the day trial was to begin, Amoco amended its petition to assert a claim stemming from the Jenkins lease, which was released in 1976.
Before trial on the merits was held, the trial court held a hearing on an exception of prescription filed by IMC and Mallinckrodt. Defendants urged the ten year prescriptive period applicable to breach of contract claims had expired because suit was filed by Amoco eighteen years after the first alleged breach (1976) and thirteen years after the second (1981). At the hearing, Amoco maintained prescription did not begin to run until it discovered the breach in 1993. Countering, defendants argued Amoco had sufficient facts at least by late 1983, which should have alerted it to the breach. The trial court denied the exception, finding Amoco proved it was never notified that defendants breached their notification obligation in the sublease. The trial court specifically held any information Amoco had of the breaches did not manifest itself with "reasonable certainty."
Prior to submission of the case to the jury, the trial court also made the following rulings:
(1) Granted summary judgment in favor of Amoco and against Mallinckrodt, piercing the corporate veil and holding Mallinckrodt liable for any judgment rendered against IMC. The trial court found IMC was "the agent, tool, or instrumentality" of Mallinckrodt;
(2) Granted a directed verdict in Amoco's favor on whether a breach occurred. The trial court found "reasonable minds could [not] come to any other conclusion but that no notice was given, definitely not written notice, nor oral notice."
The only remaining issue before the jury related to damages. After a five day trial, the jury returned a $30,000,000.00 award in favor of Amoco.
*828 Mallinckrodt appealed the trial court's judgment, asserting the trial court erred in granting Amoco's motion for summary judgment, piercing the corporate veil, and holding it solidarily liable with IMC for any judgment in favor of Amoco. IMC lodged its own appeal, asserting the following assignments of error:
1. The trial court erred in applying the doctrine of contra non valentem to suspend the running of the ten-year liberative prescription applicable to breach of contract actions under La.Civ.Code art. 3499 for alleged breaches that occurred eighteen years and thirteen years before the filing of suit.
2. The Verdict was erroneous as a matter of law in awarding damages for breach of the reassignment clause of the 1955 Sublease that allegedly occurred in 1976 and 1981 based upon production from the Marg-Tex Units that did not begin until 1989 rather than on the value of the leasehold interest on the dates of the alleged breaches; further the trial court erred in permitting Amoco to introduce evidence of such production as it was not relevant to the issue of damages.
3. The trial court erred in prohibiting Defendants from introducing evidence as to (a) the value of the leasehold on the dates of the alleged breaches and (b), alternatively, the sums Amoco would have received from its overriding royalty if there had been no breach.
4. The Verdict was manifestly erroneous in awarding damages allegedly arising from the hypothetical "farmout leases" since (a) the "farmout leases" were not covered by the 1955 Sublease, and there is no legal basis for awarding damages for breach of a sublease allegedly arising from leases not covered by the sublease; (b) such damage was an item of special damages that was not specifically pleaded; (c) Amoco offered no evidence other than its expert's speculation that it would have sought a farmout or a farmout would have been granted; and (d) Amoco offered no evidence other than its expert's speculation that Amoco would have drilled the Marg-Tex wells seven years before the wells were actually drilled by third parties, and at entirely different locations; further, the trial court erred in refusing to grant a Directed Verdict or a Judgment Notwithstanding the Verdict against Amoco on this issue.
5. The Verdict was manifestly erroneous in awarding damages allegedly arising from an assumed "new" Jenkins lease since (a) any such assumed new lease was not covered by the 1955 Sublease, and there is no legal basis for awarding damages for breach of a sublease as to a lease not covered by the sublease; (b) Amoco offered no evidence other than its expert's speculation that it would have sought or that the landowners would have granted a new lease to Amoco on the Jenkins tract in 1976; and (c) Amoco offered no evidence other than its expert's speculation that Amoco would have drilled the Marg-tex wells seven years before the wells were actually drilled by third parties, and at entirely different locations; further, the trial court erred in refusing to grant a Directed Verdict or a Judgment Notwithstanding the Verdict against Amoco on this issue.
The trial court erred in allowing Amoco's expert to speculate to the jury, without any supporting evidence and contrary to the requirements on Daubert v. Merrell and Rome v. State Farm, that Amoco (a) would have acquired a new lease on the Jenkins tract in 1976; (b) would have acquired by hypothetical farmout Texaco's and IMC's other leases in the area that were not covered by *829 the sublease; and (c) would have drilled the Marg-tex wells seven years before the wells were actually drilled by third parties, and at entirely different locations.
7. The trial court erred in prohibiting Defendants from introducing evidence of Amoco's failure to mitigate its damages.
8. The Verdict was manifestly erroneous in that the award of damages was excessive and was not supported by and was contrary to te evidence.
9. The trial court erred in Directing a Verdict in favor of Amoco on the issue of liability, finding that IMC breached the sublease by failing to give the required written or verbal notice, where there was no evidence as to verbal notice and reasonable persons could have reached a contrary verdict.
Amoco filed a cross-appeal arguing the trial court erred in not allowing it to present evidence of the "present value" of its lost production revenues.

PRESCRIPTION
Breach of contract claims are subject to a liberative prescriptive period of ten years as provided by La.Civ.Code art. 3499. Defendants note the alleged breaches occurred in 1976 and 1981. Suit was not filed until April 29, 1994, eighteen years after the first breach and thirteen years after the second breach. Therefore, defendants argued the claims prescribed on the face of the petition. The trial court denied the exception, finding any information Amoco had of the breaches "never manifested itself with reasonable certainty." Defendants have appealed this finding.
Prescriptive statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it. Bouterie v. Crane, 616 So.2d 657 (La.1993); Bustamento v. Tucker, 607 So.2d 532 (La.1992). The burden of proof on the prescription issue lies with the party asserting it; however, where the petition shows on its face that the claim has prescribed, the burden shifts to the plaintiff to prove that the prescriptive period has been interrupted or suspended.
In Louisiana law, under the doctrine of contra non valentem agere nulla currit praescriptio, prescription does not run against a party unable to act. Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206. Contra non valentem halts the running of prescription when the circumstances of the case fall into one of the following four categories: "(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant." Id. The principles of contra non valentem do not halt the running of prescription if the plaintiff's ignorance is the result of his own willfulness or neglect. Id.; Picard v. Vermilion Parish School Bd., 00-1222 (La.App. 3 Cir. 4/4/01), 783 So.2d 590, writ denied, 01-1346 (La.6/22/01), 794 So.2d 794; Matthews v. Sun Exploration & Prod. Co., 521 So.2d 1192 (La.App. 2 Cir.1988).
Although contra non valentem is a legal principle, and a determination as to whether or not the plaintiff was indeed prevented from filing its claim under one of the four circumstances is an issue of fact. Therefore, the trial court's finding of *830 fact on this issue is subject to the manifest error, clearly wrong standard of review. Picard, 783 So.d 590.
The trial court determined that the third category of contra non valentem, i.e., whether the debtor performed some act which prevented the creditor from availing itself of its cause of action, was not applicable in this case. The trial court based its denial of the exception on the fourth category, commonly referred to as the discovery rule. It provides that prescription runs from the date plaintiff discovers or should have discovered facts upon which its cause of action is based. In other words, prescription does not accrue against a party ignorant of its rights provided that ignorance is not willful, negligent or unreasonable. Wimberly, 635 So.2d at 206. For purposes of determining when a plaintiff knew or should have known of its cause of action, the plaintiff will be deemed to know what it could have learned through reasonable diligence. Renfroe v. State ex rel. DOTD, 01-1646 (La.2/26/02), 809 So.2d 947; Corsey v. State Dept. of Corrections, 375 So.2d 1319 (La.1979); Touchet v. Baker Hughes, Inc., 98-749 (La.App. 3 Cir. 2/3/99), 737 So.2d 821.
IMC contends the trial court's denial is premised on the rule established in Cole v. Celotex Corp., 620 So.2d 1154 (La.1993). In that case, the court held "[d]amage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action." Id. At 1156. The article referred to was La.Civ.Code art. 3492, which provides a one year prescriptive period for delictual actions. IMC contends this rule "is and has always been limited" to delictual actions and does not apply to breach of contract actions. The proper inquiry, argues IMC, is whether the plaintiff knew or should have learned of the cause of action by exercising reasonable diligence. The trial court's erroneous reliance on the Cole holding, according to IMC, mandates we not apply the manifest error standard in reviewing its ruling, but make our own independent de novo review.
IMC suggests Coalson discovered the breaches from his review of Amoco's records alone without resort to any other information. Thus, it contends "[o]n the basis of its own records alone, Amoco must be charged with knowledge of its cause of action more than ten years prior to the filing of suit." Coalson, however, stated he noticed there was a problem when Amoco's records did not match with Norcen's division orders for the new Marg-Tex units. These units were not created until 1989. Further, Coalson did not become aware of the breaches until after he corresponded with Norcen and then sent a contract abstractor to examine the Vermilion Parish records.
Amoco notes that it is impossible to determine precisely when assigned leases may be lost. Unlike obligations that arise on a certain date, no exact date can be set when a lease may expire. Also, leases may be continued in a number of ways, including redrilling operations, productions from different units in the same field or the granting of extensions. The record establishes reliance on the lease reassignment provisions is the primary vehicle by which an assignor learns that his lease is in danger of being lost. All the experts admitted it is customary for oil and gas companies to honor reassignment clauses. However, in this case neither IMC nor Texaco provided Amoco with notice as required by the reassignment clause.
Nonetheless, IMC argues Amoco should have discovered the lease cancellations earlier because they were duly recorded in the Vermilion Parish public records. *831 IMC cites a number of cases in support of this contention: Three Rivers Farm Supply, Inc. v. Webber, 617 So.2d 1220 (La.App. 3 Cir.1993); Ellender v. Goldking Production Co., 99-69 (La. App. 1 Cir. 6/23/00), 775 So.2d 11, writ denied, 00-2587 (La.2/16/01), 786 So.2d 96; Robin E. Owens & Assocs., Inc. v. Booth, 98-613 (La.App. 4 Cir. 2/24/99), 729 So.2d 1096, writ denied, 99-1233 (La.6/18/99), 745 So.2d 26; La Plaque Corp. v. Chevron USA, Inc., 93-1597 (La.App. 4 Cir. 5/26/94), 638 So.2d 354, writ denied, 94-2125 (La.11/11/94), 644 So.2d 395; Matthews v. Sun Exploration and Production Co., 521 So.2d 1192 (La.App. 2 Cir.1988). In all these cases, the court found the plaintiff had a duty to investigate the public records because it was clearly placed on notice of a possible injury. Amoco argues these cases do not apply to an unsuspecting plaintiff, who has no notice of the potential claim as a direct result of defendant's failure to provide information it was required by contract to furnish. We find Amoco's argument persuasive in this instance. Tom Lee, a senior landman for Amoco, testified that requiring a continuous search of the public records would place an unreasonable burden on a company:
[T]o police every single release, like the ones that were taken here, of every override in all of the parishes of Louisiana and all of the eastern half of the United States that Amoco's New Orleans office was in charge of, we would have had to have sent an army of people into every courthouse, looking for the thousands of leases and overriding royalty interests out there, just to verify that each and every one of those leases or any one of them had not been released. And we had thousands of overrides, not just this one.
We have found nothing in the jurisprudence which places such a heavy burden on a company without some prior notification of a possible problem. IMC's own experts testified ordinarily oil companies will not send employees to canvass the public records without some specific reason.
We note, as well, when the lease cancellations and the new leases were recorded in the public records only the names of the original lessor (the owner of the land) and the parties canceling the lease (IMC and Texaco) were listed. Amoco's name did not appear anywhere in the indices pertaining to the lease cancellations.
On January 6, 1992, Nancy Tessone, an Amoco representative sent a letter to Norcen Explorer questioning the amount of overriding royalty interest Amoco had been credited with in Norcen's division order. The letter stated, according to Amoco's files, "the above listed leases [the Baudoin Lease, the Broussard Lease, and the Desormeaux Lease] are presently held by production from the MAU MIOGYP RA SU. Our records also reflect the Edith G. Badouin and Broussard leases [are] held by production from the ALNC RA VU A." On September 24, 1993, at the request of Coalson, W.D. Fisher (a Resource Manager of Outside Operations for Amoco) sent a letter to Norcen questioning its calculations and noting that "Amoco's royalty and overriding royalty have been maintained by production from various units from the 1950's through present.... By notice of this letter Amoco is asserting its ownership of these mineral interests and requesting that you prepare a corrected division order and make the necessary revenue adjustment."
These letters by their plain wording expressly indicate Amoco believed it still possessed leases covering the disputed property as late as September 1993. The law of prescription references what a plaintiff *832 knew or should have known about his potential cause of action not what he could have known. While IMC maintains Amoco could have known of the lease cancellations prior to 1992, we cannot conclude from the record that it knew or should have known of them prior to that year. We also find no basis in the record for IMC's contention that Amoco would have learned of the lease cancellations but for its failure to exercise reasonable diligence.

PIERCING THE CORPORATE VEIL
Mallinckrodt seeks a review of the partial summary judgment rendered against it piercing the corporate veil and holding it liable for any judgment rendered against IMC. On appeal, summary judgments are reviewed de novo. Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191; Garcia v. John Deere Ins. Co., 01-0561 (La.App. 3 Cir. 11/7/01), 799 So.2d 1260. The appellate court asks the same questions the trial court asks in determining whether summary judgment is appropriate, i.e., whether any genuine issues of material fact exist and whether the movant is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B) and (C). Summary judgment procedure is favored and designed to secure the just, speedy, and inexpensive determination of every action. La. Code Civ.P. art. 966(A)(2).
The trial court denied Amoco's original motion for partial summary judgment on this issue. Mallinckrodt then filed its own motion for summary judgment, seeking dismissal on the grounds that it could not be held liable for any alleged wrongdoing on IMC's part. A hearing on this motion was delayed in order to allow the parties time to conduct additional discovery. After inspecting IMC's records and deposing several IMC and Mallinckrodt executives, Amoco re-urged its earlier motion. Mallinckrodt specifically requested this issue be resolved on summary judgment rather than by jury. Mallinckrodt conceded in its pre-hearing memorandum that there was "no issue of material fact and that the determination of this issue is a matter of law."
The trial court made the following findings of fact regarding the relationship between IMC and Mallinckrodt:
1. IMC was incorporated by International Minerals (now Mallinckrodt) in February of 1976 and was its sole shareholder throughout the existence of IMC, with the exception of a short period of time in which another subsidiary company owned three (3) shares of stock.
2. The first acquisition by IMC Exploration was the purchase of all oil, gas and mineral assets of Wrightsman Investment Co. for the approximate sum of $37,000,000.00. (Note: This included the leases in the "Maurice Field" which are the subject of Amoco's suit.)
3. [Mallinckrodt] advanced the total sum of $37,000,000.00 to IMC for the purchase of the Wrightsman assets. It was not carried on the books of IMC as a capital contribution by [Mallinckrodt].
4. IMC maintained several bank accounts, including a depository account, an operating account and an account for the payment of lease bonuses and rentals. However, it was the almost daily practice of [Mallinckrodt] to "sweep" the depository account of IMC whenever IMC deposited any funds into it.
5. [Mallinckrodt] would then transfer money back into IMC's operating account when IMC needed funds to pay off any of its creditors.
6. The employees of IMC were allowed to participate in the retirement plans and health insurance plans [Mallinckrodt] had set up for its employees and the same committee managed the plans for both.

*833 7. [Mallinckrodt] referred to and considered IMC as its "oil and gas division".
8. IMC's annual oil and gas exploration and development budget was approved by [Mallinckrodt] prior to its being presented to the board of directors of IMC for approval. IMC was not allowed to undertake any projects in excess of $1.5 million in any given year, without the prior approval of its parent company. Further, [Mallinckrodt] gave prior authorization for IMC to sell a natural gas plant in Perry Point, Louisiana.
9. In the 1986 annual report of [Mallinckrodt] there is a statement to the effect that in June of that year [Mallinckrodt] "signed letters of intent to sell its gas and oil segment" which was a referral to the sale of IMC Exploration to Wintershall in the latter part of 1986.
10. After the sale of IMC to Wintershall, the board of directors of IMC declared a dividend in favor of its sole shareholder, [Mallinckrodt], in the approximate amount of $97 million. This was not an actual cash transfer but had the effect of canceling a debt in the same amount that was carried on the books of [Mallinckrodt] as an accounts payable to IMC.
The trial court concluded from these facts that IMC was the "agent, tool, or instrumentality" of Mallinckrodt, and thus, Mallinckrodt could not avail itself of the corporate benefit of limited liability.
The general rule that corporations are distinct legal entities is well supported by jurisprudence and statute. La.R.S. 12:93(B); La.Civ.Code arts. 435-37; Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164 (La.1991). This court has held that only exceptional circumstances warrant the radical remedy of piercing the corporate veil. Sparks v. Progressive Am. Ins. Co., 517 So.2d 1036 (La.App. 3 Cir.1987), writ denied, 519 So.2d 106 (La.1987); Chef's Fried Chicken, Inc. v. Bull McWood, Inc., 459 So.2d 1371 (La.App. 3 Cir.1984).
The courts have recognized two exceptional circumstances where the rule of non-liability of shareholders for the debts of the corporation will be disregarded. The first is where the shareholders acting through the corporation commit fraud or deceit on the third party. The second is where the shareholders disregard the corporate formalities to such an extent that the shareholders and the corporation become indistinguishable, or "alter egos." Riggins, 590 So.2d 1164; Smetherman v. Wilson, 626 So.2d 71 (La.App. 3 Cir.1993). Shareholder fraud was not at issue in this case; with the trial court's ruling in favor of Amoco based on a finding that IMC was the "agent, tool, or instrumentality" of Mallinckrodt.
Five factors are considered by courts when determining whether to apply the "alter ego" doctrine: (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to maintain separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. Riggins, 590 So.2d 1164; Haywood v. Louisiana Sugar Cane Products, 96-1151 (La. App. 3 Cir. 3/5/97), 692 So.2d 524; Smetherman, 626 So.2d 71. The totality of the circumstances is considered when determining whether the "alter ego" doctrine applies. Riggins, 590 So.2d 1164; Smetherman, 626 So.2d 71.
The initial burden is on the shareholders to show the existence of the corporation. Once that burden is met, the burden is shifted to the challenger or third party to show the exceptional circumstances that must exist to warrant disregard *834 of the corporation's separate identity. Shoemaker v. Giacalone, 34,809 (La.App. 2 Cir. 6/20/01), 793 So.2d 230, writ denied, 01-2614 (La.12/14/01), 804 So.2d 632.
The jurisprudence has held if one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability. Hamilton v. AAI Ventures, L.L.C., 99-1849 (La.App. 1 Cir. 9/22/00), 768 So.2d 298; Green v. Champion Ins. Co., 577 So.2d 249 (La.App. 1 Cir.1991), writ denied, 580 So.2d 668 (La.1991). When corporations represent precisely the same single interest, the court is free to disregard their separate corporate identity. Id. Where a single corporation has been fragmented into branches that are separately incorporated and are managed by a dominant or parent entity, the courts have held the dominant or parent corporation liable for the obligations of its branches. Id.
In its written reasons, the trial court found IMC was indistinguishable from Mallinckrodt. This factual finding is subject to the manifest error-clearly wrong standard. See Smetherman, 626 So.2d 71; Henry J. Mills Co., Inc. v. Crawfish Capitol Seafood, Inc., 569 So.2d 1108 (La. App. 3 Cir.1990); Hamilton, 768 So.2d 298, McDonough Marine Serv. v. Doucet, 95-2087 (La.App. 1 Cir. 6/28/96), 694 So.2d 305. Therefore, the trial court's finding that Mallinckrodt was liable for the debts of IMC, based on IMC's breach of contract, can be reversed only if the record does not establish a reasonable factual basis to support the court's ruling.
Mallinckrodt argues the trial court failed to address the five-factor test to determine whether it was the "alter ego" of IMC. Specifically, Mallinckrodt contends that "no funds of the two corporations were ever commingled." It argues because accurate records were kept there was no commingling of funds. However, after creating IMC in 1976 as a wholly-owned subsidiary, Mallinckrodt invested $37,000,000 to buy oil and gas properties from Charles Wrightsman, which it put into IMC's name. IMC did not pay any interest for this cash donation. Danny Crawford, IMC's chief operating officer, also revealed that when IMC had any incoming money or profits, Mallinckrodt "had it all transferred into an account where they had discretion over it." He further stated "whenever it was time to to pay a bill or write a check for our own business, we would write that check and then they would fund it back."
The record also established Mallinckrodt's annual shareholder reports referred to IMC as a "segment" of its' "world-wide operations." The record revealed members of IMC's board of directors were authorized to vote Mallinckrodt's shares at IMC shareholder meetings, essentially representing both the parent company and IMC simultaneously. Crawford testified as follows:
Q: Now, does this document indicate that Mr. Roark was authorized to represent the parent company and sole shareholder, International Minerals & Chemical Corporation [now Mallinckrodt], at the IMC Exploration Company November 21st, 1978, stockholder meeting?
A. Yeah, it looks like it gives him the proxy to do that.
Q. Okay. Now, at this time, Mr. Roark was a director of IMC Exploration Company, wasn't he?
A. I'm sure he was.
Q. Okay. So he was a director of IMC Exploration Company, but he was also authorized to represent the parent company, International Minerals & Chemical Corporation, at the stockholders meeting; is that correct?
A. That's what it says.

*835 Q. Mr. Crawford, would you agree that since International Minerals & Chemical Corporation was the sole stockholder of IMC Exploration Company, that International Minerals could elect or determine who would serve as a director of IMC Exploration Company in any given year?
A. That's the way I understand it.
In 1986, Mallinckrodt sold the assets of IMC to Wintershall Corporation for $63,800,000.00, plus interest. The funds from the sale of IMC's assets were paid directly to Mallinckrodt. Crawford testified, although Mallinckrodt owed approximately $100 million, this "debt" was wiped off the books when the directors of IMC declared a $97 million "dividend" in favor of IMC. As the trial court noted, the dividend was not an actual cash transfer, but "had the effect of canceling a debt in the same amount that was carried on the books of [Mallinckrodt] as an accounts payable to IMC." No consideration was given to IMC, and it became insolvent. All of its operations were ceased and its employees were terminated. Mallinckrodt maintained IMC's corporate existence only on paper.
The Louisiana Supreme Court has held a corporation that absorbs the assets of a subsidiary must stand good for its debts. In Roddy v. Norco Local 4-750, Oil, Chemical, Etc., 359 So.2d 957, 960 (La.1978), the court stated as follows:
When one corporation has literally absorbed another, as Local No. 4-750 has in effect taken over Independent, which donated all its assets to Local No. 4-750, and when the "new" corporation has absorbed the membership of the old, adopted its purposes and is ruled by the same officers and directors, the transactions in no manner affect the rights of the creditors of the "old" corporation. Creditors may nevertheless proceed for the recovery of the amount due them against either corporation, or both.
In light of the record before us, we cannot say the trial court was clearly wrong in "piercing the corporate veil" and finding Mallinckrodt liable for the breach of contract debt of IMC. In 1986, Mallinckrodt divested IMC of all its assets and funds, totaling approximately $97.5 million, terminated all of its employees, and ceased all operations. Since that time, IMC has existed only on paper and has been unable to respond to its creditors. Under the circumstances the parent corporation is liable for the debts of its subsidiary. Accordingly, we find the trial court did not err in granting summary judgment in favor of Amoco on this issue.

DIRECTED VERDICT ON ISSUE OF LIABILITY
Defendants contend the trial court erred in ruling that Amoco met its burden of proving no notification was given it as required by the reassignment clause. Defendants note the reassignment clause allows for both written and/or verbal notice. They assert Amoco, which has the burden of proving it did not receive notice, produced no evidence that verbal notice was not given.
A motion for directed verdict is only granted where, after considering all evidentiary inferences in the light most favorable to the mover's opponent, it is clear the facts and inferences are so overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict. Hebert v. Bell-South Telecommunications, Inc., 01-223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, writ denied, 01-1943 (La.10/26/01), 799 So.2d 1145.
We find the trial court did not err in granting the directed verdict. IMC *836 stipulated that no written notice was given. Mark Turman, IMC's vice-president, testified he could not recall forwarding any notice of the lease cancellations to Amoco. Texaco executed an affidavit acknowledging it had no record that notice, either written or verbal, was ever given to Amoco. Numerous witnesses testified it was against standard industry practice to give such notice verbally. At the prescription hearing, IMC stipulated it breached the sublease. After a thorough review of the record, we find reasonable people could not have arrived at a contrary verdict on this issue.

DAMAGES
Following the trial court's directed verdict against Defendants on the issue of liability, the only issue before the jury was that of damages. The jury awarded Amoco $30,000,000.00. Defendants have assigned numerous errors attacking the award. We will address each assignment accordingly.

I. Legal Measure of Damages.
Defendants argue the correct legal measure of damages is the market value of the canceled leases on the date of the breach. They contend Amoco's damages should be limited to the "signing bonus" given to leases in that area at the time of the breach without any consideration given for the value of production later obtained from the areas covered by the leases.
In a Motion in Limine filed in the trial court, Defendants asked the trial judge to hold the "measure of damages for the breach of an obligation to reassign a mineral lease is the value of the leasehold interest at the time of the breach." Defendants also requested the trial court exclude the introduction of any "[e]vidence as to the quantity and value of production that occurred years after [the] alleged breach." The trial court issued a ruling denying "the defendants' motion in limine seeking to exclude evidence of production from the Maurice Field, evidence of potential farmout agreements, and evidence of production commencing in 1981." Defendants filed a writ with this court seeking reversal of the ruling. We denied the writ, specifically finding "no error in the trial court's ruling."
Amoco now urges our ruling on the writ application bars us from reconsidering the issue. In support of this contention, Amoco cites Tsatsoulis v. City of New Orleans, 99-2544 (La.App. 4 Cir. 8/30/00), 769 So.2d 137, writ not considered, 01-684 (La.5/4/01), 791 So.2d 647. In Tsatsoulis, the fourth circuit held "the law of the case doctrine applies to all prior decisions of an appellate court, including decisions rendered on supervisory writ applications, and not just to decisions on prior appeals." Id. at 139.
However, we have reviewed the previous writ application and find the ruling on the motions in limine did not specifically address the legal measure of damages. Although the motion requested the trial court hold that the measure of damages for the breach was the market value at the time of the breach, its ruling did not reach this issue. The trial court simply denied Amoco's request to exclude "evidence of the production from the Maurice Field, evidence of potential farmout agreements, and evidence of production commencing in 1981." Thus, we did not consider this issue when reviewing the merits of the writ application. We, therefore, turn to consider whether the trial court erred in not instructing the jury that the legal measure of damages is the market value of the canceled leases on the date of the breach.
IMC relies on Friedman Iron & Supply Co. v. J.B. Beaird Co., 222 La. 627, 63 So.2d 144 (1952). In Friedman the defendant breached a sales contract by refusing *837 to accept a shipment of steel and paying the agreed purchase price. The court wrote:
It is presumed, in the sale of personal property, that the parties contemplated the difference between the contract price of the thing sold and the market value at the time and place at which it was to be delivered when they entered into the contract. [citation omitted.] This court has on numerous occasions pointed out that the measure of damages for the breach of a contract of sale, where no fraud is shown, is the difference between the contract price and the market price of the goods on the date of the breach.
Id. at 149.
Defendants also cite Womack v. Sternberg, 247 La. 566, 172 So.2d 683 (1965), which involved the breach of an agreement to exchange residences when the defendant refused to carry out the agreement, and Vallot v. Champagne, 583 So.2d 549 (La.App. 3 Cir.), writ denied, 588 So.2d 108 (La.1991), where the defendant failed to comply with his obligation under an agreement to purchase a supermarket. We note that the cases cited by Defendants do not involve mineral leases, which have the obvious potential of creating substantial amounts of income if successfully developed.
La.Civ.Code art.1995 states "[D]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." (Emphasis added.) The plain language of this article requires that damages include whatever profit the plaintiff may have lost due to the inaction of the defendant. In Gibbs Const. Co., Inc. v. Thomas, 500 So.2d 764, 770 (La.1987), the Louisiana Supreme Court stated:
The proper measure of damages ... is... the amount necessary to place [the plaintiff] in the same position he would have been in had [the defendant] completely fulfilled [its obligation].
This court in Dixie Roofing Co. of Pineville, Inc. v. Allen Parish School Board, 95-1526, p. 6 (La.App. 3 Cir. 5/8/96), 690 So.2d 49, 56, writs denied, 96-2084, 96-2100 (La.11/8/96), 683 So.2d 276, 277, stated the "measure of damages for a breach of contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled. Meltzer v. Roof Coatings, Inc., 536 F.2d 663 (5th Cir.1976)."
These cases are in accord with the plain language of La.Civ.Code art.1995, and support the trial court's holding that the proper measure of damages was not the market value of the canceled leases on the date of the breach.

II. Exclusion of Defendants' Evidence.
Defendants also argued the trial court did not allow them to present evidence of the market value of the leases at the time of the breach. However, Defendants presented the testimony of its abstractor, Madeleine Kimball, who stated that leases in the Maurice Field in the early 1980's were granted for approximately $250 to $300 per acre.
Defendants also argued the jury was not allowed to hear their evidence as to the amounts of the one-sixteenth overriding royalties Amoco would have received had there been no breach. Defendants assert Amoco would have received overriding royalties of only $584,187.00 from the Jenkins lease and $597,764.00 from the other leases. However, Amoco presented expert testimony that it would have taken new leases if Defendants had complied with the reassignment clause. Amoco maintain it then would have had a full lessee's working interest in the leases, rather than just a one-sixteenth overriding royalty. Defendants argue Amoco *838 would have only had the override if IMC had not canceled the leases. However, it is undisputed that IMC did cancel the leases, and did so without informing Amoco beforehand and offering to reassign the leases.
A trial court's evidentiary rulings will not be overturned absent a showing of an abuse of discretion. Johnson v. First Nat. Bank of Shreveport, 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, writ denied, 01-2770, 02-2783 (La.1/4/02), 805 So.2d 212, 213; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. We find no abuse of discretion in this instance.
Defendants contend the trial court erred in refusing to allow evidence of Amoco's alleged failure to mitigate its damages. Despite this claim, the jury heard the testimony of Kimball who testified there was a substantial period of time in the 1980's where Amoco could have acquired new leases on land in the Maurice Field. In its closing argument, IMC's counsel stated Amoco "could have gone into Maurice ... bought some leases, drilled some wells, but they didn't. They had lots of opportunities." Amoco's witnesses testified it would have been "unethical" to acquire leases in the same field where it had farmed out its leases to IMC and Texaco.

III. Failure to Mitigate.
Defendants also argue the trial court did not allow it to formally amend its pleadings before trial to plead "failure to mitigate." Amoco argues "IMC's attempt to amend was simply an obvious ploy to reargue prescription.... IMC sought to amend its pleadings to allege that Amoco `was aware or should have been aware of the alleged breach' and, thus `failed to mitigate' it's damages by filing suit earlier." Whether this was the trial court's reason for not allowing Defendants to formally amend its pleadings is not clear. However, we find it irrelevant in this case. As noted, Defendants presented evidence of Amoco's alleged failure to mitigate, and argued it to the jury in closing arguments. The jury obviously chose to disregard this testimony.

IV. Amount of Damages.
Defendants argue the jury's award of damages was manifestly erroneous for a number of reasons. First, they argue the verdict was based on speculation rather than facts. They contend Bill Griffin, Amoco's petroleum engineering expert, offered nothing more than unsupported assumptions and consistent with Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), his testimony should not have been admitted as expert testimony.
Daubert requires that the trial court ensure all such testimony which is admitted "is not only relevant, but reliable." Id., at 589, 113 S.Ct. at 2795. To be reliable, such testimony requires more than "subjective belief or unsupported speculation." Id., at 589, 113 S.Ct. at 2795. La.Code Evid. art. 702, as does its federal counterpart, requires that expert testimony be based on "scientific, technical, or other specialized knowledge." Even then, such "testimony must rise to a threshold level of reliability in order to be admissible." State v. Foret, 628 So.2d 1116, 1123 (La.1993).
On appeal, we will not disturb the trial court's vast discretion in determining the admissibility of expert testimony unless it is clearly erroneous. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073; Budget Rent-A-Car of New Orleans v. Gradnigo, 611 So.2d 147 (La.App. 3 Cir.1992). In making this determination, the trial *839 court must determine whether the trier of fact will receive appreciable help from the testimony of the expert witness. Daubert, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469; Foret, 628 So.2d 1116.
We find the trial court did not abuse its discretion in qualifying Griffin as an expert in petroleum engineering. Griffin was a registered professional engineer with nearly thirty years of experience in the petroleum industry. We also find the trial court did not err in rejecting Defendants' Daubert objections. "As a general rule, the factual basis for an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." Loudermill v. Dow Chemical Co., 863 F.2d 566, 570 (8th Cir.1988). Griffin's testimony was lengthy and detailed. He was cross-examined extensively by Defendants. We do not find his opinions and calculations were mere speculation and cannot say that the jury's acceptance of his testimony was unreasonable:
When [a jury's] findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Lirette v. State Farm Ins. Co., 563 So.2d 850, 852-53 (La.1990) (citations omitted). We find no error with the jury's acceptance of Griffin's testimony on this issue.
Defendants also argue the jury improperly awarded damages arising from the "hypothetical farmout leases."[4] Defendants argue no one, other than Griffin, testified that Amoco would have sought farmouts in 1981. This is not correct. Tom Lee testified if Amoco had been reassigned its Maurice Field leases, Amoco would have attempted to "farm in" other leases in the area. Both Lee and Griffin testified at the time it was Amoco's standard practice to obtain "farm ins" in the Maurice Field. William Rodan, Amoco's Exploration Manager in the early 1980's, testified Amoco was actively seeking new gas discoveries to satisfy a gas contract it had with Florida Power and Light. Griffin also testified by 1980, Amoco had the highest exploration budget in its history, due in part to its need for gas and rapidly increasing gas prices. Alford Turman, IMC's vice-president, testified in the late 1970's and early 1980's, it was common for IMC to look for companies to take farmouts of its Maurice Field leases. He specifically testified that IMC had invested in a "couple of expensive, unsuccessful wells" and was reluctant to take the risk of drilling any more deep wells. Thus, the evidence established that IMC was actively seeking to farmout its leases in the Maurice Field and Amoco was seeking to farm-in as many leases as possible. The jury was not clearly wrong in accepting Griffin's testimony that Amoco would have accepted a reassignment of its Maurice Field leases and actively pursued farmouts.
Defendants further argue, while the Marg-Tex wells were actually drilled by Norcen and others in 1989, the jury's damage award is based on Griffin's testimony that Amoco would have begun drilling in 1981 and there would have been identical production from these hypothetical wells. Defendants note, in 1984 and 1986, wells *840 were drilled in the Marg-Tex reservoir, but came up dry. They assert there was no basis to simply assume that Amoco would have drilled in 1981 and immediately struck gas.
Amoco introduced a plat which established all of the canceled leases were within the Marg-Tex reservoir that was eventually discovered. Griffin testified as follows:
A. Okay. Again, you can see the outline of the field. We would have most likely drilled the wells where our leases are because, of course, you can't drill on other people's property unless you farm in, of course; so under that option we could have drilled elsewhere. But you can see on this map that the gas was right beneath our feet. We could have drilled just about anywhere on our property and found that gas.
Q. Now are you aware of the testimony from Mr. Veazey that he went back and charted all of the wells ever drilled in the Maurice field and found that more than half of them, no matter where they were drilled in the Maurice field, found gas?
A. Yes, sir. I think the chances werethe smallest chance of finding gas was 55 percent or better than half of a fifty-fifty chance of finding gas in the Maurice field.
Q. What were the chances, in your opinion, from those tracts of land; were they at 55 percent or better or worse or what?
A. A hundred percent (100%), because the gas was right beneath us. Another indicator that the gas would have been there, even before the Office of Conservation found it, was about 4,000 feet shallower a field had been discovered in the mid 60's. So these fields generally stack up like pancakes....
Mike Veazey, who testified for Defendants, admitted it was a "good possibility" Amoco would have discovered gas had it drilled on the Jenkins lease in 1981. We find the evidence presented at trial was sufficient to satisfy a jury that it was more "probable than not" Amoco would have discovered gas by drilling on the canceled leases.
Defendants also claim Griffin assumed Amoco would "not have accepted a reassignment of the Jenkins lease in 1976 since it was expiring" and instead Amoco "would have acquired an entirely new lease on the Jenkins tract." Amoco argues this was not what Griffin stated. The record revealed the following testimony from Griffin:
Q. And, in fact, when you did your damage calculations you assumed that the Jenkins lease had died and that you assumed a new lease, didn't you?
A. No. There was awell, you could possibly look at it that way, but what that assumption is is that we went to the landowner and we made him the same deal that the next guy actually made. We increased his royalty in my calculations from one-eighth to I think it was one-sixth. That's what's in my calculations. That could have been a renewal of an existing lease, it could have been an extension of an existing lease or whatever. All I did was I moved what would have satisfied that royalty owner based on actual events, and apparently he was satisfied by increasing his royalty from one-eighth to one-sixth, and that's what I did.
Q. And that's because in 1976, another party bought leases on the Jenkins property; isn't that correct?
A. That's what I used to calibrate my model.
Griffin's testimony revealed the landowner had granted a new lease on the property in 1976. There was ample support for the *841 jury to assume the landowner would have granted Amoco a lease extension for similar terms.
Lastly, Defendants contend the jury's award of $30,000,000 was excessive and an abuse of its discretion. Their argument on this issue is essentially the same as addressed above: That the award was based on unsupported assumptions and contrary to the evidence. We disagree. In making his estimations, Griffin simply calculated the production figures from the Office of Conservation and used the average gas prices for the years in question. He concluded Amoco lost $70,000,000 in production, for which IMC was liable for half, or $35,000,000. We cannot say the jury abused its discretion in rendering a damage award of $30,000,000.

AMOCO'S APPEAL
Defendants filed a motion in limine to exclude Amoco's evidence of the "present value" of its lost production revenues. The trial court granted the motion, which Amoco contends was erroneous. Amoco argues the function of the law of damages is to make the injured party whole, and the only way it can be restored to the "same position" it would have occupied, but for the breach of the contract, is to adjust the dollars it would have earned in the past to "present value." Amoco presented proffered testimony that "the most appropriate method to adjust Amoco's past losses to present value would be to use Amoco's historical `return on equity' as reported in its annual reports for the years 1981 to 1997." Under this theory, Amoco concludes its present value of lost income was approximately $175,000,000, with Defendants' half share approximately $87,500,000. We find no merit in Amoco's argument. Amoco is only entitled to the legal interest rate for judgments provided in La.Civ.Code art. 2000.

DECREE
For the foregoing reasons, we find no basis to overturn the judgments of the lower court and jury. All costs of this appeal are assessed to Defendants, IMC Exploration Company and Mallinckrodt, Inc.
AFFIRMED.
NOTES
[1] The five mineral leases are referred to as (1) the "Jenkins Lease," (2) the "Baudoin Lease," (3) the "Broussard Lease," (4) the "Desormeaux Lease" and (5) a fifth lease not involved in this litigation.
[2] A division order is the unit operator's calculation of each lease owner's share of production from the unit.
[3] Mallinckrodt, Inc., was originally called International Minerals & Chemicals Corporation before it changed its name in the 1990's.
[4] A "farmout" is a negotiated contract assigning a lease to a party that wishes to explore it for production. Essentially, a party who owns or leases land will often seek to "farmout" the lease rather than spend its own money to drill on it. The party "farming out" the lease retains an interest in any minerals discovered on the property.