2008 WY 49

**David K. STONE and Nicholas B. Loundagin, Appellants (Plaintiffs),**

v.

**DEVON ENERGY PRODUCTION COMPANY, L.P., and Carpenter & Sons, Inc., Appellees (Defendants).**

No. S–07–0166.

Supreme Court of Wyoming.

April 22, 2008.

Representing Appellants: Stephen R. Winship of Winship & Winship, P.C., Casper, Wyoming.

Representing Appellees: Scott P. Kloster-man of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶1] David K. Stone and Nicholas B. Loundagin owned operating rights under a state oil and gas lease which they assigned to Devon Energy Production Company, L.P. (Devon) and Carpenter & Sons, Inc. (Carpenter). After Devon and Carpenter failed to offer to reassign the operating rights to them six months before the lease expiration date, Mr. Stone and Mr. Loundagin filed a complaint asserting that Devon and Carpenter breached the assignment contract and should be ejected from the leasehold. In addition, they pleaded trespass and conversion, and sought an accounting and injunctive relief. The district court granted partial summary judgment for Devon and Carpenter on the breach of contract claim, concluding that the lease had not expired and the reassignment obligation was never triggered. We hold the district court's interpretation of the reassignment clause was in error, but affirm the partial summary judgment order because, under the particular circumstances, no contract damages can be proven.

## ISSUES

[¶2] The following issue is determinative of this appeal:

Whether the district court properly granted summary judgment for Devon and Carpenter on the ground that the supplemental agreement did not require them to make an offer of reassignment by October 2, 2001.

## FACTS

[¶3] In April of 1997, a state oil and gas lease covering land located in Johnson County, Wyoming was issued to Mr. Stone. The lease provided that it would remain in effect for a primary term of five years and so long

thereafter as oil, gas and associated hydro-carbons were produced from the lands in paying quantities and that it could be extended beyond the primary term absent production as provided by Wyoming law. The lease further provided that if drilling, completion, testing or reworking operations were being diligently conducted during the primary or an extended term, the lease would continue in effect so long as such operations continued and as long thereafter as oil and gas were being produced in paying quantities.

[¶4] A year and a half after the lease was issued, Mr. Stone assigned an undivided 50% of the operating rights under the lease to Stone Exploration, Inc. (SEI) and the other undivided 50% of the operating rights to Mr. Loundagin. SEI and Mr. Loundagin then assigned the "shallow" rights (from the surface down 1,000 feet) under the lease to Carpenter. Carpenter drafted a letter agreement effective February 1, 2000, memorializing the terms of the assignment from SEI and Mr. Loundagin. In exchange for the shallow rights, Carpenter agreed to pay a bonus payment of nearly $165,000. SEI and Mr. Loundagin reserved an overriding royalty interest in the shallow rights and retained ownership of the "deep" rights (below 1,000 feet). The letter agreement provided that: " 'Carpenter' shall offer reassignment of the operating rights to 'Stone' one year prior to the expiration of each lease." [1] A document identified as Exhibit A was attached to the letter agreement listing the leases and their "expiration" dates. The expiration date for the state lease was identified on Exhibit A as April 2, 2002, the date the primary term ended.

[¶5] In May of 2000, the parties entered into a supplemental agreement by which Devon acquired most of the rights that SEI and Mr. Loundagin previously had assigned to Carpenter. Carpenter retained a 10% working interest. The supplemental agreement modified and amended parts of the letter agreement, including the provision in the original agreement requiring Carpenter to offer to reassign the operating rights one

---

1. The letter agreement referred to "the expiration of *each* lease" rather than "the expiration of *the* lease" because with the assignment of the state lease, SEI and Mr. Loundagin also assigned a number of federal leases to Carpenter. The federal leases are not at issue in the present case.

year prior to expiration of the lease. The reassignment clause in the supplemental agreement provided:

> 6. All assignments naming Devon as provided for in this Supplemental Agreement shall, in addition provide that the said Assignee and its successors and assigns shall offer in writing to Stone Exploration, Inc. for the benefit of the Assignor, a reassignment of all its rights under any of the leases and lands referred to herein *not later than 6 months prior to the expiration of each such lease.*

(Emphasis added.) At the time the parties executed the supplemental agreement, there was no production of oil and gas on the lease and it was set to expire on April 2, 2002.

[¶ 6] Devon and Carpenter did not make an offer, written or otherwise, to reassign the operating rights under the lease to SEI and Mr. Loundagin by October 2, 2001, six months before the lease's primary term was to expire. In December of 2001, Mr. Stone wrote a letter to Devon referencing paragraph 6 of the supplemental agreement, advising that the lease expiration date was less than four months away and asking for compliance with the agreement. Devon responded by letter a month later, stating in pertinent part:

> Clearly the intent of the agreement and this paragraph in particular is to prevent the leases from expiring. Devon acquired the oil and gas leases with the intent of developing them for coalbed methane production. The paragraph in this agreement is often used to provide the assignor with the option to take reassignment of the oil and gas lease in the event the assignee is not going to drill a well or take some other action which would prevent the lease from expiring.
>
> Devon Energy Production Company, L.P. (Devon) intends to take some action to prevent the lease from expiring. As a result, the lease will not expire on April 2, 2002 and, therefore, notice to Stone Explo-

ration, Inc. and the reassignment offer was not due at this time. A[t] such time as we anticipate expiration of the lease, Devon will comply with the terms of Paragraph 6.

It is undisputed that Devon began drilling operations on March 30, 2002, and such operations were being diligently conducted prior to expiration of the primary term. The well was completed and production obtained by mid-April 2002.

[¶ 7] In 2006, with production continuing and Devon and Carpenter still claiming ownership of the shallow rights under the lease, Mr. Stone and Mr. Loundagin filed a complaint for ejectment, specific performance, breach of contract, trespass, conversion, an accounting and injunctive relief. Devon and Carpenter answered the complaint, generally denying the claims and asserting that the term of the lease had been extended before the primary term ended so they were not required to make a reassignment offer.

[¶ 8] Mr. Stone and Mr. Loundagin filed a motion for partial summary judgment in which they asserted that no genuine issues of material fact existed on their ejectment and breach of contract claims and they were entitled to judgment as a matter of law on those claims. Devon and Carpenter filed a response in which they reiterated their claim that the lease had never expired because drilling operations commenced before the end of the primary term and, therefore, their obligation to offer to reassign the operating rights was not triggered.[2] At the summary judgment hearing, Devon and Carpenter orally moved for summary judgment in their favor on the breach of contract claim. By order dated July 9, 2007, the court granted Devon's and Carpenter's motion and denied Mr. Stone's and Mr. Loundagin's summary judgment motion on their breach of contract and ejectment claims and certified the matter pursuant to Rule 54(b).

---

**2.** Devon and Carpenter attached a number of exhibits without supporting affidavits to their summary judgment response. Mr. Stone and Mr. Loundagin moved to strike the exhibits and the district court granted their motion. Devon and Carpenter did not appeal the district court's ruling and so the question of whether the exhibits were properly stricken is not before us. Regardless, the parties are in agreement that the reassignment clause is clear and unambiguous, meaning consideration of other evidence is unnecessary to determine the parties' intent.

## STANDARD OF REVIEW

[¶ 9] Our review of the district court's order is governed by the following standards:

> When reviewing an order granting summary judgment, we consider the record *de novo*. Our review of orders granting summary judgment is governed by W.R.C.P. 56(c), which provides in pertinent part:
>
>> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> We view the evidence in the light most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We interpret unambiguous contracts as a matter of law.

*Christensen v. Christensen*, 2008 WY 10, ¶ 11, 176 P.3d 626, 629 (Wyo.2008) (citations omitted.)

## DISCUSSION

[¶ 10] The district court concluded the language of the supplemental agreement clearly and unambiguously required Devon and Carpenter to make an offer to reassign the operating rights to Mr. Stone and Mr. Loundagin prior to six months before the lease actually expired. The district court further concluded, however, that the obligation to make the offer never arose because the lease term did not expire. The district court declined to read the reassignment clause as requiring an offer of reassignment before six months prior to the expiration date of each such lease. The district court concluded instead that the term "expiration" in the reassignment clause must be considered in light of the lease terms which allowed the lease to be extended in several ways. The district court concluded, as long as the lease had not expired and continued in full force and effect by virtue of production, an extension, or drilling, completion, testing or reworking operations during the primary term or under an extension, Devon and Carpenter were under no obligation to make a reassignment offer.

[¶ 11] Mr. Stone and Mr. Loundagin claim that the district court's ruling ignores the intent of the parties and the six month deadline expressly provided for in the agreement. They assert that the district court improperly considered extrinsic evidence, i.e. the lease, to reach the conclusion that, contrary to the express language of the reassignment clause, Devon and Carpenter were not required to make a reassignment offer by October 2, 2001, if they intended to drill before the lease expired. By its ruling, they contend, the district court in effect modified the written agreement after the fact by interpreting it on the basis of what happened after the six month deadline had come and gone. They assert the effect of the district court's ruling was to write the six month deadline out of the agreement.

[¶ 12] Devon and Carpenter assert that the term "expiration" must be given its plain and ordinary meaning; pursuant to its terms, the lease could be extended in various ways; drilling operations were under way before the primary term expired and the term of the lease had been extended; therefore, the lease did not expire and the obligation to offer reassignment was not triggered.

[¶ 13] From the parties' and our own research, it seems there are no cases involving a reassignment clause like the one at issue here. *See* Howard R. Williams & Charles J. Meyers, *Oil and Gas*, § 428.2 (2002). As one legal commentator has noted:

> [The reassignment clause] is a most dangerous provision. There are unknown facets to it, for there are relatively few court decisions construing it.... It is a clause which should be insisted upon by every assignor of a lease who reserves an overriding royalty ..., and it is a clause which should be restricted and finely honed by the assignee.

Paul W. Eaton, Jr., *"The Reassignment Provision—Meaningful or Not?"* 20 Rocky Mountain Mineral Law Institute 601.

[¶ 14] Reassignment clauses are almost exclusively found in the oil and gas arena and, while there is no set language used, many such clauses require a reassignment offer only in the event that the assignee intends to let the lease expire. *Id. Walton v. Atlantic Richfield Co.*, 501 P.2d 802 (Wyo. 1972), for example, involved a reassignment clause that provided as follows:

> If assignee shall desire to surrender and release said lease to the [lessor] before said lease terminates by operation of law of the lease terms, Assignee will ... give notice to Assignor at least thirty (30) days prior to the rental or expiration date, and if within fifteen (15) days thereafter, Assignor ... shall notify [Assignee] that such lease ... be reassigned to Assignor, then Assignee will ... reassign such lease to Assignor ...; but, if within such fifteen (15) days from date of notice, Assignor shall fail to notify Assignee that Assignor ... so desire[s] reassignment, Assignee may, if it so desires, surrender to the [lessor] such lease....

*See also Tenneco Oil Co. v. Gaffney*, 369 F.2d 306 (10th Cir.1966) ("If assignee or his assigns wishes to relinquish this lease at any time, he must offer reassignment to assignor at least sixty (60) days before any rental due date or final expiration date ..."); *McLaughlin v. Ball*, 431 S.W.2d 305 (Tex. 1968) ("Assignee shall always have the right to release and surrender the lease hereby assigned, provided that before releasing or surrendering, and at least sixty (60) days prior to the next rental due, he shall first notify assignor ..."). Many reassignment clauses also require the assignor to respond to an offer of reassignment within a specified time period or lose the right to reassignment. *Walton*, 501 P.2d at 803.

[¶ 15] The purpose of a reassignment clause has been described as follows:

> In order to understand why the reassignment clause is used, we must keep in mind the established law that in the absence of specific agreement the owner of the working interest, the lessee, owes no duty (except possibly good faith) and has no fiduciary relationship to the holder of an overriding royalty. Without notice or liability to the overriding royalty owner, the lessee may allow the lease to terminate by nonpayment of rentals, by surrender or by failure to drill. The lessee has no duty to preserve the lease or to reassign it to the overriding royalty owner. The overriding royalty owner, then, finds himself owning a property interest of some value, and very often an interest of great value, which may expire before the end of the primary term of the lease on account of the action or inaction of the lessee. The continued existence of the interest is nakedly dependent upon the lessee's plans for the lease.
>
> The absence of a duty owed by the lease owner to the overriding royalty owner renders the latter's ownership very precarious, to say the least. As a consequence every assignor of a lease retaining an overriding royalty interest should protect his interest by incorporating a reassignment obligation in the assignment.

Eaton, *supra*, at 603–604.

[¶ 16] In the present case, all parties agreed that the intent of the reassignment clause contained in their agreement was to avoid the loss of the lease. Mr. Stone and Mr. Loundagin assert the clause clearly required Devon and Carpenter to make an offer of reassignment no later than October 2, 2001, six months before the end of the primary term. They claim the six months was necessary to give them time to obtain production before the end of the primary term and avoid loss of the lease. In contrast, Devon and Carpenter claim that they always intended to obtain production before the primary term expired and as long as they carried out that intent they were not required to make the reassignment offer. They cite *Amoco Prod. Co. v. Texaco, Inc.*, 838 So.2d 821, 830 (La.Ct.App.2003) for the proposition that "it is impossible to determine precisely when assigned leases may be lost" because "[u]nlike obligations that arise on a certain date, no exact date can be set when a lease may expire."

[¶ 17] In *Amoco*, the court considered the following reassignment clause:

In the event that the Assignee should elect to surrender, let expire, abandon or release any or all rights in said lease acreage, or any part thereof, the Assignee shall notify the Assignor not less than sixty (60) days in advance of such surrender, expiration, abandonment or release, and if requested to do so by the Assignor, the Assignee immediately shall reassign such rights in said lease acreage, or such part thereof, to the Assignor.

*Id.* at 826. Amoco alleged that Texaco breached this clause when it allowed one lease to expire and released other leases without notifying Amoco. Prior to trial, the district court granted a directed verdict in Amoco's favor, finding that reasonable minds could not reach any conclusion other than that no notice was given. Texaco appealed. In addition to the statements referenced by Devon and Carpenter concerning the uncertainty of lease expiration dates, the appellate court made the following observations concerning the importance of reassignment clauses:

The record establishes reliance on the lease reassignment provisions is the primary vehicle by which an assignor learns that his lease is in danger of being lost. All the experts admitted it is customary for oil and gas companies to honor reassignment clauses. However, in this case neither IMC nor Texaco provided Amoco with notice as required by the reassignment clause.

*Id.* at 830. The court affirmed the district court's finding that reasonable minds could only conclude no notice was provided as required by the reassignment clause.

[¶ 18] With this background in mind, we turn to consideration of the provision before us. In interpreting a written agreement, our primary purpose is to determine the true intent and understanding of the parties at the time and place the agreement was made. *Wells Fargo Bank Wyo., N.A. v. Hodder,* 2006 WY 128, ¶ 21, 144 P.3d 401, 409 (Wyo.2006). We begin our analysis by considering *de novo* the plain language of the agreement. *Id.* We construe the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made. *Id.*

We construe the contract as a whole, attempting to avoid a construction which renders a provision meaningless. We strive to reconcile by reasonable interpretation any provisions which apparently conflict before adopting a construction which would nullify any provision.

*Id.*

[¶ 19] In the present case, the parties and the district court agreed that the reassignment clause is unambiguous. It clearly required Devon and Carpenter to make a reassignment offer not later than six months prior to the expiration of the lease. The difficulty with interpreting the clause to mean actual expiration of the lease as Devon and Carpenter assert is that the lease would have to expire before it could be determined when they were required to make the offer of reassignment. If they had the intent to obtain production and received an extension any time before April 2, 2002, then they would not be required to make a reassignment offer. Under this interpretation, the six month offer would have to be made only after it was clear the lease was going to expire. However, once the lease expired, it would not be possible to offer to reassign the lease six months before it expired.

[¶ 20] We avoid interpreting a contract in a manner rendering any provision meaningless. *Bradley v. Bradley,* 2007 WY 117, ¶ 15, 164 P.3d 537, 542 (Wyo.2007). Consistent with this approach, in *Tenneco,* 369 F.2d at 308, the Tenth Circuit refused to interpret a reassignment provision in a fashion that would have rendered it meaningless. The interpretation advocated by Devon and Carpenter, and accepted by the district court, renders the six month provision meaningless. Interpreting the agreement to mean that the expiration date was entirely dependent upon the assignee's action or inaction after the six month deadline has passed would deprive the assignor of the protection

the provision was intended to provide. We decline to accept that interpretation. We hold that the reassignment clause required Devon and Carpenter to make an offer to reassign the operating rights to Mr. Stone and Mr. Loundagin on or before October 2, 2001.

[¶ 21] This interpretation does not require inserting any words into the reassignment clause. Considering the language of the reassignment clause in the context in which it was written and looking to the surrounding circumstances, the subject matter, and the purpose of the agreement, it is clear that the parties intended the term "expiration" to mean the expiration date of the lease that was contained within the lease itself.[3] The best evidence of that intent is the fact that the parties attached Exhibit A to the letter agreement specifically identifying the state lease expiration date as April 2, 2002, the date on which the primary term ended. This interpretation is consistent with the underlying purpose of reassignment clauses generally which is to protect assignors against loss of their overriding royalty interest "prior to the anticipated life of the lease, that is, the end of the primary term." Eaton, *supra*, at 617. *See also* James M. Colosky, Chapter 5, Rocky Mountain Mineral Law Institute, *"The Reassignment Provision—The Agony in the Oversight,"* 5–12.

[¶ 22] In rejecting the claim that the reassignment obligation was dependent on the assignees' subjective intent to allow the lease to expire, we find it significant that unlike many of the reassignment clauses quoted by other courts and commentators, the clause these parties drafted and agreed to did not contain language to the effect that a reassignment offer was required "if the assignee desires to surrender the lease." Unlike the provision at issue in *Amoco*, 838 So.2d at 826 ("In the event that the Assignee should elect to surrender, let expire, abandon, or release any or all rights in said lease"), the clause Devon and Carpenter agreed to omitted any language indicating the reassignment obligation was dependent on Devon's and Carpenter's intent. The omission of language that appears to be standard in oil and gas reassignment clauses suggests that, rather than being dependent upon the assignee's intent, the parties intended the reassignment offer to be made on a date certain—prior to six months before the expiration of the lease, or before October 2, 2001. Had they intended to make the assignees' intent determinative, they could have inserted one of the standard phrases to that effect in the reassignment provision.

[¶ 23] In addition, we note the parties renegotiated the reassignment provision in their supplemental agreement to state that notice was to be given six months prior to expiration rather than one year as the original agreement had provided. Understandably, assignors tend to favor long periods of advance notice to give them more time to start drilling within the primary term and assignees would prefer short notice periods so they can hold the lease as long as possible before tendering it back. Eaton, *supra*, at 612. This renegotiation of the notice date indicates Devon and Carpenter wanted control of the operating rights for a longer period before having to make the reassignment offer and that the parties were well aware of the date that would trigger the reassignment obligation.

[¶ 24] On the basis of this analysis, we hold the district court's interpretation of the contract was in error. However, we can affirm a district court's summary judgment order on any basis apparent in the record. *Stewart Title Guaranty Co. v. Tilden*, 2005 WY 53, ¶ 22, 110 P.3d 865, 874 n. 7

---

3. Mr. Stone and Mr. Loundagin assert on appeal that the district court's consideration of the lease in interpreting the supplemental agreement was improper. Because all parties agreed that the supplemental agreement was unambiguous, they argue that its meaning must be derived from the four corners of the document and not from what they characterize as extrinsic evidence. To reiterate, we construe contract language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made. *Wells Fargo*, ¶ 21, 144 P.3d at 409. In the context of this case, the lease and the letter agreement are "surrounding circumstances" which must be considered in interpreting the supplemental agreement. The district court did not err in considering the lease.

(Wyo.2005). Here, Mr. Stone and Mr. Loundagin cannot allege any facts that would support a finding that they were damaged by the breach of contract. In an action for breach of contract, the plaintiff is entitled to such damages as would put him in the same position as if the contract had been performed, less proper deductions. *Capshaw v. Schieck*, 2002 WY 54, ¶ 10, 44 P.3d 47, 52 (Wyo.2002). Contract damages, like tort damages, are intended to compensate the plaintiff for his loss. *Horn v. Wooser*, 2007 WY 120, ¶ 17, 165 P.3d 69, 73 (Wyo.2007). Accordingly, where the plaintiff has suffered no loss, there are no damages. In the relatively few cases involving oil and gas lease reassignment clauses, courts have unanimously held that the measure of damages for breach of the clause is the value of the lease *at the time the lease terminates.* Eaton, *supra,* at 614. *See also,* Colosky, *supra,* at 5–29. In *Tenneco,* 369 F.2d at 309, the Tenth Circuit held that damages for failure to reassign were measured by the market value of the lease when it terminated, and not any earlier time. Here, the lease never terminated and thus, Mr. Stone and Mr. Loundagin incurred no damages. They have continued to enjoy the benefit of their bargain, e.g. the timely payment of all overriding royalties due under the lease. We have found no case in which the overriding royalty owner was deemed to have been damaged by a failure to reassign when the lease did not terminate. This is not surprising since the fundamental purpose of the reassignment clause is to protect the overriding royalty interest holder from termination of the lease—no termination, no damage.

[¶ 25] This result does not mean Mr. Stone and Mr. Loundagin had no means of enforcing the reassignment clause. If, at the time of their demand for re-assignment, they had sought injunctive relief or specific performance and had been able to prove the necessary requirements for such relief, the district court could have ordered the reassignment. However, having failed to seek that relief, and Devon having performed its obligation to maintain the lease and pay the overriding royalties when due, Mr. Stone and Mr. Loundagin are not now entitled to relief.

The reassignment clause was intended to provide them sufficient time to drill a well or otherwise extend the lease during its primary term, not to allow the overriding royalty interest owners to reacquire the lease after production was obtained. We affirm the district court's partial summary judgment order on the basis that, as a matter of law, Mr. Stone and Mr. Loundagin cannot show that they were damaged. The lease was not lost and they have received the overriding royalty payments due under the agreement.

[¶ 26] With respect to the remaining claims for ejectment, trespass and conversion, it seems clear from the limited record before us that they, like the damages, cannot be established. Throughout the contractual relationship, Devon has held the right to drill and produce from the lands subject to the lease. The reassignment clause was intended to give Mr. Stone and Mr. Loundagin the right to reassignment of the operating rights in the event it appeared the lease was going to be lost. It was not lost and Devon was operating properly as the working interest owner under the terms of the assignment. It, therefore, seems unlikely that the assignors can prove the elements of ejectment, trespass and conversion because each of these claims requires proof that Devon wrongfully entered and exercised dominion over the property to the exclusion of the assignors. However, the district court has not addressed these claims and we remand this matter for that purpose.

[¶ 27] The partial summary judgment on breach of contract is affirmed and the matter is remanded for consideration of the remaining claims.

GOLDEN, Justice, dissenting.

[¶ 28] I respectfully dissent. The supplemental agreement at issue required Devon and Carpenter to offer reassignment of all pertinent acquired rights under the lease to SEI "not later than 6 months prior to the expiration of each such lease." The majority opinion concludes the parties intended the end of the primary term of the lease to be the equivalent of the "expiration" of the lease. While understandable that a date cer-

tain for "expiration" would be desirable, I do not believe it is our judicial function to supply a date that the parties themselves did not agree upon. It would have been a simple matter for the parties to have specified the end of the primary term of the lease as the trigger for the reassignment clause, but they did not do so. They agreed that the reassignment clause would be triggered by the "expiration" of the lease.

[¶ 29] The primary goal of this Court in construing contracts is to discern and honor the intent of the parties. I agree that the intent of the parties in including the reassignment provision was to prevent the lease from expiring without giving SEI the opportunity to save it. I do not believe the intent of the parties can be fulfilled by substituting "end of the primary term" for "expiration." Such construction is contrary to the interests of all the parties.

[¶ 30] It is contrary to SEI's interests because it would provide SEI with only one opportunity to save the lease—based entirely upon the date of the end of the primary term of the lease. Devon and Carpenter would have had no contractual obligation to provide SEI with the opportunity to save the lease should they have allowed the lease to expire before the end of the primary term by non-payment of rent or other inappropriate action or inaction. Further, by the language of the reassignment provision as construed in the majority opinion, the provision would lapse after the primary term of the lease. Should SEI have chosen not to force reassignment at that time, Devon and Carpenter would have no further contractual obligation to offer to reassign the lease.[4] It is doubtful SEI entered into the supplemental agreement with the intent of accepting such a situation.

[¶ 31] As for Devon and Carpenter, requiring the reassignment provision to be triggered by the date of the end of the primary term potentially seriously threatens

their respective interests in the lease. The provision is mandatory. SEI could demand reassignment of the lease without any regard for what could have been significant investment by Devon and Carpenter. It is unlikely Devon and Carpenter would have accepted such a risk from the outset.

[¶ 32] The majority opinion expresses concern that, without a time certain, the reassignment provision would be rendered meaningless. I disagree. That does not mean that I agree with the district court to the extent its decision can be read to suggest the trigger for the reassignment provision is the actual expiration of the lease. Rather, as I read it, and with knowledge that parties to a contract are bound by an implied duty of good faith and fair dealing, the reassignment provision is triggered by knowledge that events will occur that will result in expiration of the lease.

[¶ 33] The lease is clear on the events that could cause the lease to expire. For instance:

Section 2. TERM OF LEASE. This lease shall become effective on the day and year set out below and shall remain in effect for a primary term of five (5) years and for so long thereafter as leased substances may be produced from the lands in paying quantities. This lease may also be extended beyond its primary term in the absence of production of leased substances as may be provided by the statutes of the State of Wyoming and the regulations of the Board of Land Commissioners adopted pursuant thereto. Provided, however, if drilling, completion, testing or reworking operations are being diligently conducted, either during the primary term or during any extension thereof, this lease shall continue in full force and effect so long as such operations are being conducted and so long thereafter as oil or gas may be produced in paying quantities. This lease

---

4. As reflected in paragraph 6 of the majority opinion, SEI did make a request for reassignment under the reassignment provision in December 2001. However, after Devon's reply that it had no intention of allowing the lease to expire, the record does not reflect any follow up by SEI with a further demand until this suit was

filed in November 2006. Even if I were to agree with the majority opinion's construction of the reassignment provision, I would still uphold the grant of summary judgment because SEI waived enforcement of the provision as it pertains to the end of the primary term.

may be relinquished or terminated at an earlier date as herein provided.

The lease also provides for an annual rental payment. The existence of events that would cause the lease to expire pursuant to the terms of the lease generally do not happen overnight.

[¶ 34] In the instant case, for example, Devon and Carpenter were well aware of the date of the end of the primary term. Because of the amount of foundation work that needs to be done before production can begin, they almost certainly would have known six months prior to that date if they would be able to hold the lease by means of production or as otherwise provided by law. If, at that time, they had not been diligently working towards production, or even more obviously, if they had no intention of holding the lease, then the reassignment clause would have been triggered. Likewise, in the future, Devon and Carpenter most likely will have advance knowledge of when their operations are such that the lease will expire. With that knowledge, they then are bound to comply with the reassignment provision.

[¶ 35] Devon and Carpenter must allow SEI an opportunity to save the lease when they know their actions will not be enough to do so. By focusing on the practical, as versus theoretical, "expiration" of the lease, I believe the reassignment provision imposes such a requirement. I do not believe the reassignment provision was included in the supplemental agreement with the intention of granting SEI a potential windfall. I therefore would uphold the grant of summary judgment to Devon and Carpenter.